Joseph D. JEFFERS, Appellant,

v.

UNITED STATES of America, Appellee.

Connie B. JEFFERS, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 21721, 21721–A.

United States Court of Appeals Ninth Circuit.

March 27, 1968.

Murray Miller (argued), Philip M. Haggerty (argued), William G. Pearson, Jr., Phoenix, Ariz., for appellant.

Edward E. Davis, U. S. Atty., Lawrence Turoff, Asst. U. S. Atty., Phoenix, Ariz., for appellee.

Before HAMLEY and DUNIWAY, Circuit Judges, and ZIRPOLI, District Judge.

ZIRPOLI, District Judge.

Appellants, husband and wife, were each convicted, at a joint jury trial, of thirteen counts of mail fraud and were each fined $500 on each count and were placed on three years' probation.

Joseph Jeffers is the spiritual and secular leader of the Kingdom of Yahweh, a religious sect with its headquarters in Arizona. The Kingdom maintained one bank account, upon which Joseph Jeffers was authorized to draw. The headquarters of the Kingdom also served as the residence of appellants and as a meeting place for members of the Kingdom. Religious tracts were published by the Kingdom, which was essentially an evangelical organization which emphasized *prophecy,*

*revelation,* and *extrasensory perception.* The *Kingdom* solicited new members by various commercial means and word-of-mouth. Appeals for money to members were made from time to time and certain representations were made in connection with said appeals, which representations as to the uses to which funds would be put and as to the financial condition of the Kingdom presumably form the bases of the charges here involved; namely, violations of 18 U.S.C. § 1341 (mail fraud).

Each count stems from a separate mailing of material containing representations allegedly made with fraudulent intent. The false and fraudulent representations alleged in the indictment as having been made to further a scheme and artifice to defraud by the use of the mails are set forth in three subparagraphs to paragraph 7 of the first count of the indictment and are incorporated by reference in each of the remaining counts thereof. These subparagraphs read as follows:

(a) That all contributions and donations received from victims would be and were being used to defray the cost of promoting the religious purposes of the Kingdom of Yahweh, Inc., whereas in fact a large portion of said contributions were used by the defendants in placing bets at para-mutual (sic) dog and horse tracks;

(b) that Spirit Guide drawings and paintings supplied by the defendants for $15.00 to $50.00 each were the product of a distinct and conscious spiritual vision whereas in fact they were the product of no such influence;

(c) that Reincarnation Revelations[1] supplied by the defendants for $25.00 were not opinions or ideas of the defendants' own minds but rather came "from akashic records and from Yahweh himself", whereas in fact they were the mere opinions and ideas of the defendants' own minds.

Most of the proof adduced at trial went to establish facts surrounding the charge in subparagraph (a) above that money was solicited for religious purposes when in fact money was used for betting at the dog track. This evidence consisted primarily of numerous checks cashed at the dog track and numerous photographs and reels of film depicting Joseph Jeffers at the betting window and at the track energetically cheering on his favorite dog.

At the trial certain statements of defendants made to Postal Inspectors were introduced into evidence, but the jury was not instructed to pass on the voluntariness of said statements and no request for such instruction was made.

Appellants maintain (1) that the bets were for the religious purposes of enhancing the Kingdom's treasury and furthering its "religious" studies of extra-

---

1. A typical excerpt from one of these Revelations reads as follows:

Going back into time, the outline of the following lifetime appears on the regressed horizon.

The country is NORWAY * * * The year is approximately 1795. You are a MAN or MALE in this lifetime. Your name is: ERIC OUSLAV.

* * * * *

When you were 17 years of age, you joined a PIRATE ship * * * A jealous co-pirate tried to kill you one night when you were sleeping. [Y]ou drew your sharp sword and killed him. * * * Since this act was in self-defense, you soon got over it.

* * * * *

Regressing a few hundred years back into time, another lifetime appears on the regressed horizon.

The country is FRANCE, and the year is approximately 1275 * * *

* * * You were also given a medal of honor for your active part during the *Inquisition.* * * *

* * * * *

The country is PALESTINE. The time is approximately 4 B.C.

* * * * *

You married a lovely Roman girl, but later in life you took on 3 concubines. Altogether, you had a total of 17 children.

The court notes that none of the recipients of any of the appellants' materials were shown to have been anything but satisfied with the revelations.

sensory perception, and that therefore the conviction infringes their free exercise of religion; (2) that the government failed to prove that the betting was not a religious purpose, but implicitly relied on the fact that the jury might assume that such an act could not be a "religious" purpose; (3) that if appellants in good faith believed that the reincarnation revelations and spirit guide drawings were products of spiritual sources, as represented, then, even if not in fact the product of such sources, the first amendment protects such representations; (4) that the indictment is vague because it fails to specify exactly how much money was fraudulently employed at the dog track; (5) that the trial court erred in not instructing the jury on voluntariness; (6) that the evidence was insufficient to implicate Connie Jeffers in any scheme to defraud.

The government, having failed to allege in subparagraph (a) that betting on the dogs did not serve a religious purpose and having failed to offer any evidence whatsoever that betting on the dogs did not serve any religious purpose of the Kingdom of Yahweh,[2] now, in its brief on appeal and at oral argument, disclaims any contention that betting on the dogs could not be a religious purpose or that it was not a religious purpose in this case. Rather, the government asserts that the defendants, in their solicitations for funds, represented that money received would go for *specific* purposes, none of which was betting on dog races. The government maintains that appellants represented that money would be used for office supplies and that the Kingdom's bank account was inadequate to meet operating expenses.[3]

2. The only evidence in the record as to the relationship of betting on the dogs to the religious purposes of the Kingdom of Yahweh came from some of the followers of the Kingdom who testified that there was wagering authorized and participated in by members of the congregation in an attempt to raise money and that games of chance were a part of the congregation's metaphysical research and study of extrasensory perception. For example, Helen Wakefield testified: "Dr. Jeffers called a special prayer meeting of the Kingdom of Yahweh's people, and we were instructed to fast and pray until we received an answer from the spirit as to what we could do in case of this emergency. And I remember in this particular case we were given two numbers. I was given two numbers, someone else was given two numbers, and for two dollars we got a Big Q ticket" (R.T. 629), on which there was a winning of "some $2800" (R.T. 629).

Edward Chase, when asked if their studies of extrasensory perception included games of chance, replied, "Yes, this would include games of chance, because I think Dr. Ryan in Duke University had these experiments, and we are actually following his experiments, and ours as an addition to gain ESP." (R.T. 571).

3. For example, the following are excerpts from the proof adduced at trial in the form of appeals for money and representations mailed by the defendants:

Exh. 1:
(1961)
 *     *     *     *     *
I know you were expecting a Kingdom Newsletter, but this is why it is impossible this week. We cannot buy stamps, paper, envelopes, and supplies without cash. We have had a good credit but we have been behind lately, so we must pay cash for these supplies and equipment. * * *

Last Night, Connie and I prayed and cried nearly all night asking for guidance. * * * Yahweh spoke to me early this morning and said to write our best friends immediately. * * * * * * [W]e need $2000.00 IMMEDIATELY * * * [P]lease return all you can AIR MAIL after you pray about it * * *.

Exh. 2:
(1962)
 *     *     *     *     *
 *     *     *     *     *
Several weeks ago we received a *money order* for $3,010.00. * * * Yesterday to our shock and surprise, the MONEY ORDER was returned to us marked CANCELLED * * *.

In the meantime we called the bank, and since we do not keep any balance of more than a few dollars our checks for the telephone bill, lights, water, gas, car payment, typewriter payments, et cetera, were turned down. * * * We had hoped to make enough sales to finish paying the current bills, but

While the government may very well have intended this latter fraudulent representation or scheme to defraud as the basis of the charges made in the indictment, the fact remains that *it did not so charge*. Neither this court nor the trial court is free "to change the charging part of an indictment to suit its own motions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes." Russell v. United States, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962). Such variance is fatal in this case for while a conviction based on the theory now advanced by the government may be permissible, we cannot say from the record before us that such was the theory adopted by the petit jury or the grand jury, or that they adopted the same theory. Therefore, we reverse.

The proof centered primarily on the allegation in subparagraph (a) of the indictment:

> that all contributions * * * would be * * * *used* to defray the costs of promoting the *religious purposes* of the Kingdom * * * *whereas in fact* a large portion of said contributions were *used* by the defendants *placing bets at a* * * * *dog* * * * *track* * * * [Emphasis added]

now that our checks have been turned down, my heart is so heavy I can hardly speak or write * * *

* * * * *

Please remember, my dear friends, that we must have at least $2800 in the next 10 days. We do not know what you can do, but whatever you do please pray very earnestly and help us every bit you can. * * *

Exh. 3:

(1963),

* * * When we had our financial crisis last year, we mortgaged all of our printing equipment, typewriters, office equipment. * * *

* * * We have a $4500 mortgage, and we have been told that unless we get a $1500 payment on it immediately all of our equipment will be sold at auction * * *

In other words, the indictment conclusively assumed either (1) that betting was not a religious purpose, or (2) that according to the representations in the solicitations of contributions, betting was not a purpose for which the contributions were to be expended. Most likely, a jury would find that the charges of the indictment were proved by merely showing that some of the contributions were used for betting. Indeed, such proof *would* establish what is charged in the indictment. Hence, by the wording of the indictment, the government was relieved of the burden of proving either (1) that betting was not a religious purpose within the context of the indictment, or (2) that defendants represented that the contributions would be used for specific religious purposes. It is the latter which the government contends, on this appeal, was the basis of the indictment. Because we do not know what the petit jury might have considered adequate to convict, and because we do not think the indictment charges what the government contends was charged, the indictment suffers from the fatal infirmity diagnosed in Russell v. United States, supra at 770, 82 S.Ct. at 1050.

To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment

* * * We are praying that Yahweh will put it on somebody's heart to send us [money] * * * to help us clear this up completely * * *

Evidence also established that the bank account of the Kingdom usually reflected a positive balance during the times in question, though at times it was overdrawn. Considering the evidence in the light most favorable to the government, a permissible inference is that at some of the times when representations of dire need were made, there were in fact adequate funds available. Considering, then, the representations as to solvency and as to the purposes for which the funds would be applied, we cannot say that the government did not or could not prove the commission of *a crime*. The question is whether the crime proved was *the crime* charged. That question we cannot answer in the affirmative.

would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him.

The government either (1) must claim and prove that the betting was not a "religious purpose", see United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L. Ed. 1148 (1944), or (2) must allege in the indictment that representations were made that contributions would be applied only to specific purposes and that betting was not one of them. Even if the latter was *proved* at trial, we cannot say that such was intended to be *charged* by the grand jury, for the indictment is susceptible of being construed to charge the former by its very wording which seems to equate betting with a nonreligious purpose. Therefore, because a jury might have thought that a conviction was compelled by the mere proof that some money was applied to betting, when under neither permissible alternative would such proof *alone* suffice, we must reverse.

Taking this view of the case, we do not reach the first amendment and other questions raised in the briefs.

As for the contentions concerning the reincarnation relevations and spirit guide drawings, we do not reach those issues either. Rather, we reverse the convictions and direct the entry of judgment of acquittal on all counts for the following reason: The spectacle presented to the jury—of a 67 year old eccentric purporting to have psychic powers, and his attractive 27 year old wife betting contributors' funds at the dog races—was so highly prejudicial that we cannot conclude that a fair trial was had on the remaining allegations, especially because the jury might have thought that such betting was alone sufficient to convict on some of the allegations in the indictment.

Reversed and remanded.