UNITED STATES of America, Appellee,

v.

Robert Llewelyn LOVE, Appellant.

UNITED STATES of America, Appellee,

v.

Arthur Luray LYON, Appellant.

Nos. 75-1590, 75-1591.

United States Court of Appeals,
Ninth Circuit.

April 27, 1976.

As Amended on Denial of Rehearing in No. 75-1590 May 27, 1976.

Rehearing Denied in No. 75-1591 June 1, 1976.

---

Thomas J. McLaughlin (argued), Phoenix, Ariz., for appellants.

Thomas N. Crowe, Asst. U. S. Atty. (argued), Phoenix, Ariz., for appellee.

## OPINION

Before HUFSTEDLER, KILKENNY and SNEED, Circuit Judges.

KILKENNY, Circuit Judge:

Appellants were indicted, tried by a jury, and convicted of numerous violations of 18 U.S.C. § 1341, the Mail Fraud statute. They were indicted with three others, one defendant entered a plea of guilty and another was found not guilty. Love was convicted on eight counts. Lyon was convicted on nine counts. The fifth, also convicted, is not a party to this appeal.

## FACTUAL BACKGROUND

We agree with appellee that the contentions on appeal do not require an exhaus-tive review of the evidence. The evidence presented by the government, if believed, was sufficient to show that appellants, with the others named in the superseding indictment, participated in the operation of an illegal scheme under which victims were induced to make investments on which a high interest rate was promised. Investments were generated in response to newspaper and direct mail solicitations with most of the investments being made in response to advertisements in two newspapers, each with large circulations, published in the state of Arizona. Over two hundred solicitations appeared in each newspaper between April 22, 1972, and July 18, 1973. The advertisements, quite uniformly, promised an investor 12 percent interest on his money, payable monthly, the principal to be returned in one year with all investments "100% secured." The newspaper advertisements were followed by a series of mail solicitations.

Contrary to the representations in the newspaper articles and the mail solicitations, the appellants and their co-indictees had no assets to secure any investments and operated no finance company, other than placing a name on an office door. The only interest paid to investors was that which was paid out of the principal of their own investments.

## THE COMMON APPEALS

One issue is common to both appeals. Both appellants moved for a mistrial on the ground of misconduct of a juror during the course of the trial and the alleged failure of the court to hold an adequate hearing on the juror's conduct.

On the opening day of a nine day trial, the court ordered members of the jury not to discuss the merits of the case or anything about it among themselves or with anyone else until the case was submitted for deliberation at the end of the trial.

Despite this cautionary instruction, the juror Quail, an obvious busybody, called a courtroom deputy clerk and started a gen-

eral discussion of the witnesses and the trial in general, and made other calls of like nature. Appellants do not challenge this conduct. However, during the lunch recess on the sixth day of the trial, Quail observed juror Russey and appellant Love sitting on a bench at a bus stop and seemingly engaged in conversation. Immediately after lunch, Quail reminded Russey of the court's admonition. This was in the presence of all jurors save one. She suggested that the juror's conduct should be reported to the judge.

The juror MacIntosh also observed the occurrence at the bus stop and also inquired whether Russey should report the matter to the court. Appellants concede that the conversation between Russey and Love on the bus stop bench was entirely innocent. One was sitting at one end of the bench and the other some distance away. As an automobile passed by, Russey said that he would give a hundred dollars for it, and Love responded that the owner might accept. Immediately after this exchange, appellant Love reported the occurrence to his lawyer and the extent of the conversation. His lawyer felt the incident was so innocuous as not to require a report to the court.

After being advised of the incident and after discussions with counsel, the court decided to hold a hearing and explore: (1) the significance of the bus stop contact between Russey and Love, and (2) the importance of the subsequent conversation in the jury room between Quail and Russey relating to the bus stop incident.

The first issue was evidently resolved to the satisfaction of everyone, although at the time appellant Lyon's attorney had a fear that the incident might prejudice his client because juror Russey might have been impressed with his conduct and consequently turn his wrath on the other defendants.

■ On the appeal, however, both appellants emphasize the second issue and urge that the conversation between Quail and Russey in the jury room created an atmosphere prejudicial to both appellants. It is argued that the conversation was prejudicial (1) because Quail, in front of the jury, accused Love and Russey of misconduct, and (2) because the jury never learned of the innocence of the incident. We hold that the record does not support these contentions. Conceding that Quail accused Russey of a violation of the court order in front of all but one juror, the record also reveals that Russey explained the innocence of the affair to the jurors present. During the course of the hearing, Quail testified she told Russey that he had violated the order and should report the incident to the judge. The court thereupon asked Quail what Russey had said in response to her accusation. Her answer,[1] and other testimony,[2] set forth in the footnotes, demonstrate that the innocence of the conversation was made clear to the jury. Even a casual reading of Quail's testimony makes it manifest that when confronted in the jury room, Russey emphasized that he and Love were just talking about the price and model of an automobile. That Russey explained to all eleven jurors who were present is made even clearer by his own testimony.[3] The

1. "Well, he just said he was sitting there and this man came and sat down beside him, and I said 'Well who spoke first?' And he said 'I think I did. We were talking about the model of a car.'" (R.T., Vol. V, Page D15).

2. See Footnote 3 and the following testimony from the witness Daudet: "So when they came from lunch, she said she jumped him and said *'You are not supposed to do that'* and she said he got a little huffy with her and said *'But we weren't doing anything. I just asked—we were just talking about cars.'*" [Emphasis supplied.] [R.T., Vol. V, p. D4, lines 13–17].

3. "Court: Did you discuss this conversation or anything about it with any of the other jurors?

Witness: No, sir. Well, I did say something to them down there yesterday when they— Mrs. Quail said 'Should you say something to somebody in there about what you said?' And I said 'I haven't said anything to refer to this— what has happened in this courtroom.'

Court: Was that in front of the other jurors?

Witness: Sir?

Court: Was that in front of the other jurors?

Witness: Yes, sir.

Court: Was there anything else said by you or any of the other jurors?

testimony in the footnotes demonstrates that Russey told all members present in the jury room that the bus stop bench conversation had nothing whatsoever to do with what was going on in court.

Thus, the undisputed evidence at the hearing shows that when Quail confronted Russey in the jury room, eleven members of the jury were present. She told him that he had been seen talking to Love, that this violated the court's order and that he should report this to the court. Russey explained that the conversation with Love had nothing whatsoever to do with the trial, but with the price and model of an automobile. Quail insisted that he should report it to the court anyway because "The little book" said they weren't supposed to talk at all. The twelfth member of the jury was not present but, insofar as the record discloses, heard nothing whatsoever about the incident. Russey testified that none of the other jurors said anything. Quail said that MacIntosh, who had also observed the exchange, had decided that the incident was trivial.

Appellant Lyon's additional contention that prejudice resulted from the bus stop conversation because the other jurors did not know " . . . whether or not the communication concerned the trial . . . " is refuted by Russey's testimony and there is no evidence to the contrary. We believe that any possible prejudice that might be implied from Quail's concern was completely eliminated when the court excused her from further participation in the trial.

At this point we observe that appellants' counsel stood on their motions for a mistrial and did not press the court for an instruction to disregard the incident, which the court indicated it would give. Evidently, counsel thought that the giving of such an instruction would just emphasize the incident.

## CONTROLLING AUTHORITIES

Both the government and appellants rely, in large measure, on *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). Remmer had been convicted in a jury trial of willful evasion of income taxes. During the course of the trial, an unnamed third person approached a juror and told him it would be profitable to find for Remmer. The juror reported the incident to the court. The incident and the subsequent FBI report were considered only by the prosecutors and the judge. The Supreme Court vacated the judgment and remanded to the district court with instructions to hold a hearing to determine whether the entire incident was prejudicial to defendant and, if so, to grant a new trial. The Court there said that "in a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, . . . presumptively prejudicial," *Id.* at 229, 74 S.Ct. at 451, 98 L.Ed. at 656, but that the presumption was not conclusive, the burden being on the government, after notice to defendant and a hearing, to show that such contact with the juror was harmless. The *Remmer* Court went on to say that in the hearing the court should determine the consequences, the impact thereof upon the juror, and whether or not it was prejudicial, with all interested parties being permitted to participate.

Manifestly, *Remmer* is to be distinguished from the case before us. On our record, we are not dealing with a private communication between a juror and some-

---

Witness: No, sir."

*    *    *    *    *    *

"Attorney: . . . What I'm concerned with is whether or not Mrs. Quail before the other jurors pointed you out as someone who had perhaps been engaged in misconduct with my client, Mr. Love. Did she suggest to you that you had an obligation to explain this to somebody?

Witness: Well, that's what she said, ought to tell somebody about it.

"Attorney: All right. And then did you then explain anything to the other jurors?

Witness: I told them I didn't say nothing, only what I said down there." (R.T., Vol. V, pages D22 and D23).

one who is obviously interested in the acquittal of a defendant. The record before us clearly demonstrates that the conversation between the juror and the appellant Love was entirely innocent. Beyond that, the court followed the mandate of *Remmer* and held a hearing with all interested parties being permitted to participate.

Somewhat more closely in point is *Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). There, the court bailiff in speaking of the defendant, told a juror, "Oh that wicked fellow he is guilty." Defendant was convicted. The Supreme Court reversed quoting *Turner v. Louisiana,* 379 U.S. 466, 472–473, 85 S.Ct. 546, 550, 13 L.Ed.2d 424, 429 (1965):

> "[T]he 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of defendant's right of confrontation, of cross-examination, and of counsel."

There, the Court emphasized the "official character of the bailiff" who made the remarks and evidence that one of the jurors felt she *"was prejudiced by the statements."* Here, as distinguished from *Parker,* the alleged error is based on the statement in the jury room of a juror that another juror had breached the order and rules of court by speaking to one of appellants. The juror's statement was not directed against either appellant. The accusation was against a fellow juror. *Parker* is not controlling.

A related problem was presented in *United States ex rel. Owen v. McMann,* 435 F.2d 813 (C.A.2 1970). After conviction, Owen secured an affidavit from one of the jurors in which it was said that other jurors, during deliberations, had argued matters which were not in evidence, *i. e.,* that defendant had been in trouble all his life, that he was suspended from the police force in connection with unauthorized use of a prowl car and other matters which would indicate that his background and character was bad. We agree with Judge Friendly that:

> "The touchstone of decision in a case such as we have here is thus not the mere fact

of infiltration of some molecules of extra-record matter, with the supposed consequences that the infiltrator becomes a 'witness' and the confrontation clause automatically applies, but the *nature of what has been infiltrated and the probability of prejudice."* *Id.* at 818.

We also agree with Judge Friendly that:

> " . . . to allow verdicts to be attacked merely for casual juryroom references on the basis of matters not in evidence would add unduly to the already fragile state of criminal convictions." *Id.* at 817.

The court in *Owen* held that the case fell on the impermissible side of what is there termed a "by no means bright line." Here, as distinguished from *Owen,* we have no accusatory statements by a juror regarding appellant's character. Given Russey's explanation of the innocence of the bus bench incident, there is not even an implication that appellant engaged in misconduct with the juror, nor in this light is Quail's accusation of any significance.

Our circuit has not been confronted with a similar case. However, a somewhat related problem was involved in *United States v. Klee,* 494 F.2d 394 (C.A.9 1974). There, on a motion for a new trial, the defendant presented an affidavit which stated that during one or more recesses, contrary to the judge's instructions, many of the fourteen jurors [including alternates] expressed premature opinions on the guilt of defendant. We distinguished *Remmer* on the ground that there was no *private communication* with a juror, nor evidence of influence by the news media, but merely a premature discussion between the jurors themselves. In affirming the judgment of the district court, we said:

> "The test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *Id.* at 396.

Implicit in the order denying the motions for mistrial in the present case is the finding that neither the bus stop, nor the jury room incident, was harmful to either of the

appellants or prevented them from having a fair trial. As we said in *Klee*:

> "When a wise and experienced judge, who presided at the trial and observed the jury, comes to such a conclusion, it is not for us to upset it. The trial judge 'was in a better position than we are to determine whether what happened was prejudicial.'" *Id.* at 396.

Here the district court had the opportunity to see and hear the witnesses and to weigh their testimony. It was in a far better position than we to judge the effects of the incidents. It is for these reasons that we have held that the decision whether or not to grant a motion for mistrial is in the discretion of the trial judge and the failure to grant a mistrial is only error if it was a clear abuse of discretion. *United States v. Short,* 500 F.2d 676 (C.A.9 1974), *cert. denied,* 419 U.S. 1000, 95 S.Ct. 317, 42 L.Ed.2d 275; *United States v. Faulkenbery,* 472 F.2d 879, 882 (C.A.9 1973), *cert. denied,* 411 U.S. 970, 93 S.Ct. 2161, 36 L.Ed.2d 692. In this case, the trial judge exercised his discretion in accord with the *Remmer* principles and after a review of testimony given at the hearing upon the motion for mistrial, we cannot say that he abused his discretion in denying the motion.

Obviously a remand for a specific finding on prejudice would serve no purpose. The order denying the motions after a hearing was held and evidence pertaining to the motions was presented speaks as clearly as specific words.

Other cases cited by appellants are not in point. For example, *United States v. Howard,* 506 F.2d 865 (C.A.5 1975), where one juror in the presence of the others, stated that defendant had been in trouble two or three times before and this statement was used to pressure other jurors to vote for conviction. *State v. McChesney,* 114 Wash. 113, 194 P. 551 (1921), where a juror strongly intimated that the defendant was a thief. *Koenigstein v. State,* 101 Neb. 229, 162 N.W. 879 (1917), where a judgment of conviction was reversed when one juror told his fellow jurors that to his personal knowledge the defendant's character and reputation were bad.

Appellants have failed to cite a case which would justify a reversal on this record. Moreover, our independent research has failed to reveal any authority which would justify setting aside the verdicts on this issue.

Although appellants now complain of the court's action immediately following the hearing when it instructed the jurors not to converse with the defendants, the attorneys, anyone else, or among themselves, appellants did not take an exception to the instruction at the time. In these circumstances, they are in no position to complain.

We might have a better record if appellants had requested an appropriate instruction directing the jury to disregard the incident or had suggested interrogating the jurors as to what, if any, effect the incident might have on their judgment. The latter procedure would have been open to appellants even after the return of the verdicts. However, we believe that such procedures would have overly emphasized the whole affair far beyond its importance. Moreover, we believe that the hearing held by the district judge measured up to the requirements of *Remmer*. Even at this late date, there is no suggestion that the court should have instructed on the subject or that he should have in any way expanded the hearing. Because the irregularity did not in any way affect the substantial rights of the appellants we are required to disregard it under the provisions of Rule 52(a), F.R.Crim.P.

### THE LYON APPEAL

Appellant Lyon argues that since the respective counts in the indictment charged him with certain fraudulent representations while "well knowing" that the representations were falsely made, the court erred when it instructed the jury that:

> "A statement or representation is false and fraudulent within the meaning of the statute if known to be untrue or *made with reckless indifference as to its truth*

*or falsity* and made or caused to be made with the intent to deceive." [Emphasis supplied.] (R.T., Vol. VIII, page G198).

He urges that the district court "rewrote the indictment" when it told the jury that appellant made fraudulent representations if he knew them to be untrue *or if he made them with a reckless indifference to their truth or falsity.*

Appellant's reliance on cases such as *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), and *Jeffers v. United States,* 392 F.2d 749 (C.A.9 1968), is misplaced. In *Stirone* there was a fatal variance between the crime charged in the indictment [importation of sand] and the evidence received on trial [exportation of steel]. The court instructed the jury that it could base a conviction upon either importation of the sand or exportation of the steel. Obviously, the variance was fatal. In *Jeffers,* the defendant was charged with mail fraud in promoting the religious purposes of a particular sect that was led by the defendant when, in fact, the money was being used for placing bets at dog and horse races. The Government, having failed to offer any proof that the betting was not for a religious purpose, offered evidence to show that defendant had represented that the money received would be used for office supplies. The court held that the indictment did not charge the defendant with receiving the money for the latter purpose and that the variance between the indictment and the proof was fatal.

Here the indictment sufficiently charged that Lyon acted knowingly when it said he acted "for the purpose of executing the . . . scheme." *Glenn v. United States,* 303 F.2d 536 (C.A.5 1962). Furthermore, in mail fraud cases,

"One who acts with reckless indifference as to whether a representation is true or false is chargeable as if he had knowledge of its falsity." *Irwin v. United States,* 338 F.2d 770, 774 (C.A.9 1964).

The same general rule is recognized in *United States v. Reicin,* 497 F.2d 563, 571 (C.A.7 1974); *United States v. George,* 477 F.2d 508, 514 (C.A.7 1973), *cert. denied,* 414

U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61; *United States v. Henderson,* 446 F.2d 960, 966 (C.A.8 1971); *Blachly v. United States,* 380 F.2d 665, 672 (C.A.5 1967); *United States v. Benjamin,* 328 F.2d 854, 862 (C.A.2 1964); and *Baker v. United States,* 115 F.2d 533, 541 (C.A.8 1940).

The indictment would have been sufficient without the allegation that Lyon well knew the statements he made were misrepresentations. The challenged language does no more than reiterate the knowing state of mind implicit in other language of the indictment. It is thus surplusage. *Mathews v. United States,* 15 F.2d 139 (C.A.8 1926). Even as surplusage, if the language were sufficiently misleading as to have prejudiced Lyon's preparation of his defense, it might require a reversal. *United States v. LeMay,* 330 F.Supp. 628 (D.Mont.1971). We see no such prejudice. Lyon had competent counsel who is chargeable with knowledge of the state of mind necessary to prove fraud under section 1341. *Cf. Fuller v. United States,* 132 U.S. App.D.C. 264, 407 F.2d 1199 (1968 (*en banc*)), *cert. denied,* 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969). (Leventhal, J., discussing counsel's role when defendant convicted of lesser included offense). Counsel had ample time to prepare the defense, so any difference between the indictment and the instruction did not prejudice Lyon.

◼ Next, Lyon urges that the district court erred in failing to grant his motions for judgments of acquittal on the six counts of the indictment alleging mailings on July 17th and 18th, 1973, on the ground there was no showing that these mailings were for the purpose of executing a scheme to defraud.

For this contention, Lyon cites *United States v. Kelem,* 416 F.2d 346 (C.A.9 1969), *cert. denied,* 397 U.S. 952, 90 S.Ct. 977, 25 L.Ed.2d 134 (1970), and *Merrill v. United States,* 95 F.2d 669 (C.A.9 1938), in support of his argument that the fraudulent scheme, if any, terminated prior to the dates of July 17th and 18th mentioned in

six counts on which he was convicted. Neither case helps appellant. *Merrill* held that the scheme in question had terminated and was not in existence when the letters were mailed some eight months after the last fraudulent sale. *Kelem* correctly holds that the propriety of a conviction in a case like this does not turn upon a mechanical determination of when the mailing occurred. Rather, such a determination depends upon a careful examination of the evidence in each case to determine the contribution made by mailings to the scheme's success.

The evidence in this case shows (1) that the continued operation of the company depended upon obtaining new investments with which to make interest payments. There was no other income. (2) That practice was prohibited by the order of the Corporation Commission closing the company as of July 10th. (3) The July 17th and 18th mailings represented to investors that all was well and, as the indictment alleged, by implication at least, induced the defrauded persons into a false sense of security. (4) Neither the mailograms nor the letters, or, for that matter, any other communication made any mention whatsoever of the cease and desist order. Appellant's only excuse was that he did not think that would be of any interest to the investors. (5) Newspaper solicitations continued to be printed after the cease and desist order and continued to the date of the July 18th letter. This continuing solicitation of funds flies in the face of appellant's present contention that the scheme had been abandoned.

The record makes it clear that the fraud continued to deceive investors after July 17–18, even though the appellants were not in a position to appropriate the proceeds. For example one man mailed a $3,000.00 check to the company on July 28, 1973, completely unaware of any irregularities in the company. That a continuing relationship existed between the company and the investors after July 18th is beyond question.

The controlling law to be applied to these facts is stated in *Marshall v. United States,* 146 F.2d 618 (C.A.9 1944), where the court recognized the rule that the use of the mails after a scheme to defraud is completed is not a use for the purpose of executing the scheme and then proceeded to say:

"However, where the scheme charged in the indictment involves the continuing solicitation of public interest as well as a continuing relationship between schemer and victims and where letters are sent through the mails to further the relationship and to lull the victims into a sense of security and inaction, the mails clearly are used to accomplish the purpose of the scheme, and the essential ingredients of the mail fraud offense are present." *Id.* at 621.

Here, the success of the scheme depended upon the receipt of new funds in addition to a continuing relationship with the investors designed to discourage any demands for the return of the principal investment.

Appellant's argument that the counts in question did not properly charge an offense since the "fruits" had already been obtained before the mailings and consequently could not have been " 'for the purpose of executing' the scheme" was rejected in *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), where the Court in referring to *Kann v. United States,* 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), and *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), clearly recognized that subsequent mailings can in some circumstances provide the basis for an indictment under the mail fraud statutes. *Sampson, Id.,* 371 U.S. at 80, 83 S.Ct. at 175, 9 L.Ed.2d at 140. The same rule is recognized and followed in *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). There, the Supreme Court stated the test as " . . . whether these mailings were sufficiently closely related to respondent's scheme to bring his conduct within the statute." *Id.* at 399, 94 S.Ct. at 648, 38 L.Ed.2d at 608.

The Fifth Circuit in the recent case of *United States v. Ashdown,* 509 F.2d 793, 799 (C.A.5 1975), has succinctly stated the rule in the following language: " . . . [I]t is a well established principle of mail fraud

law that use of the mails after the money is obtained may nevertheless be 'for the purpose of executing' the fraud. . . . " There is no rule that the money must change hands after the mailing.

## CONCLUSION

Other contentions advanced by appellants have received our attention. They are meritless.

Finding no error, we affirm the convictions.