UNITED STATES of America, Plaintiff-Appellee,

v.

Robert L. BEECROFT, Arthur T. Harrison, James F. Hennig, and Delbert L. Rogers, Defendants-Appellants.

Nos. 78–2190, 78–2203, 78–2235 and 78–3444.

United States Court of Appeals, Ninth Circuit.

Nov. 19, 1979.

As Amended Dec. 14, 1979.

Frank T. Vecchione, Michale J. McCabe, Joseph A. Milchen, Frank & Milchen, San Diego, Cal., for defendants-appellants.

Charles R. Hayes, Special Asst. U. S. Atty. (on the brief), Michael H. Walsh, U. S. Atty., Charles R. Hayes, Special Asst. U. S. Atty. (argued), San Diego, Cal., for plaintiff-appellee.

Before HUFSTEDLER and WRIGHT, Circuit Judges, and FERGUSON, District Judge.*

EUGENE A. WRIGHT, Circuit Judge:

Defendants were officers in a company which helped inventors to promote and market their ideas. Approximately 1,800 clients paid fees of $1,500 to $1,800. Despite numerous representations of the company's success, no invention was ever marketed successfully.

On this appeal, each appellant claims the evidence was insufficient to sustain his conviction of mail fraud and conspiracy to commit mail fraud. In addition, appellant Harrison contends a Dun and Bradstreet report was improperly admitted against him, and appellant Beecroft asserts that the sentence imposed on him was improper. We disagree and affirm each conviction.

* Of the Central District of California.

## FACTS

Development and Marketing International, Inc. (DMI) was founded in 1971 by appellant Harrison and four others not involved in this appeal. DMI purported to develop, fund, manufacture, and market inventions or ideas. For a fee of either $1,500 or $1,800, the company was to provide the client a supposedly individualized portfolio with an extensive analysis of the product's marketability. Once the portfolio was completed, the client could sign a representation agreement whereby DMI's product brokers would attempt to place the invention with a manufacturer.

North American Associates, Inc. (NAA) was founded by Beecroft in late 1972 to purchase DMI and continue its business. NAA conducted the business in the same manner as had DMI. Later, in 1973, several other corporations, including Production and Marketing International, Inc. (PMI), were formed by those involved in DMI and NAA. The district court found these companies constituted a single operation which attempted to assist inventors in the development of ideas. The entire operation failed in January 1974.

DMI and the other entities[1] advertised their services to the public. These advertisements are in large part the basis for defendants' convictions.

The most inculpating piece of promotional literature was the company's first brochure which announced: "DMI—One of the Best Friends an Idea Ever Had." It contained a photograph of the Union Bank Building in San Diego, in which the DMI office was located. The words identifying the building were removed, however, creating the false impression that the entire building housed DMI's headquarters.

The brochure also said that DMI was an international company with "every conceivable facility for developing an idea into a product," a staff experienced in patent and invention development, "seasoned veterans" who "have the knowledge and ability to

1. For simplicity, this opinion will refer to the associated companies as "DMI."

present your product to the proper manufacturers for production and distribution," and "the capability of distribution on an international basis." Later brochures were essentially condensed versions of the first.

In a trial without a jury, the district court found that all representations that DMI was an international company were false. It found:

(1) that DMI did not have the facilities to develop an idea into a product because the only facility owned by DMI was a small machine shop which was never used to manufacture a product developed by DMI;

(2) that DMI's staff did not have experience in the patent and invention development field, and that the staff was not qualified or knowledgeable to present products to manufacturers for production;

(3) that DMI did not have officers in principal cities throughout the United States; and

(4) that the photograph of the Union Bank Building was intended to create, and did create, a false impression concerning the size, importance, and capacity of DMI.

The district court found also that the defendants made false representations in addition to those in the advertisements. The court found that an article in the San Diego Union financial section showing a payment of $10,000 to inventor Fred Fortado as "advance royalties" was deceptive and calculated to mislead the public. In reality, the money was for the rights to Fortado's invention and was used partly to offset the purchase of Fortado's machine shop.

The court also determined that in 1972 George Goff, DMI's first president, Rogers and Harrison falsified information for a Dun and Bradstreet report on DMI. Inventors were then given copies of "DMI References," urging them to see bankers or stock brokers for the Dun and Bradstreet report.

The court also found fraudulent a 1972 suit for rescission filed by NAA against DMI. A stipulation was entered into, rescinding the sale of DMI to NAA and re-

lieving NAA from the obligations of DMI. The judgment included a $20,000 award to NAA on which DMI was liable as a corporation. The court found the suit calculated to deceive creditors and clients by giving the impression that DMI and NAA were independent organizations.

The court also found other aspects of DMI's sales approach fraudulently induced inventors to enter contracts with DMI. For example, the work done on the $1,500 and $1,800 contracts was identical, yet this fact was concealed from the salesmen. The company also accepted duplicate inventions from different inventors.

The court found that each defendant made, or permitted or encouraged others to make, false representations. It found that each defendant knew the false representations were being made to induce inventors to purchase DMI's services. Finally, it found that the evidence showed beyond a reasonable doubt that the defendants were involved in a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension.

## DISCUSSION

### I.

### SUFFICIENCY OF THE EVIDENCE

#### A. The Standard of Review.

In reviewing the contention that the evidence was insufficient to sustain their convictions for mail fraud and conspiracy to commit mail fraud, we consider the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 82, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Valentin*, 569 F.2d 1069 (9th Cir. 1978); *United States v. Ramos*, 476 F.2d 624, 625–26 (9th Cir. 1973). All reasonable inferences supporting the conviction must be drawn, including decisions regarding the credibility of witnesses. *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir. 1969). The judgment must be sustained if there is substantial evidence to support it. *United States v. Rojas*, 458 F.2d 1355, 1356 (9th Cir. 1972).

B. *Elements of the Offense.*

■ Under 18 U.S.C. § 1341, the essential elements of mail fraud are: (1) a scheme to defraud, and (2) a knowing use of the mail to execute the scheme. *United States v. Kaplan*, 554 F.2d 958, 965 (9th Cir. 1977); *United States v. Goldberg*, 455 F.2d 479, 480 (9th Cir. 1972).

■ When one acts, knowing that the use of the mails will follow in the ordinary course of business and the mails are in fact used, the actor causes the mails to be used and makes a knowing use of the mails within the meaning of Section 1341. *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1953); *United States v. Dondich*, 506 F.2d 1009 (9th Cir. 1974). In the instant case, appellants knowingly used the mails to promote the enterprise. The issue is whether the government sustained its burden of proving a fraudulent scheme.

C. *Proof of Fraud.*

■ To prove a fraudulent scheme, the government must demonstrate specific intent to defraud. *United States v. Payne*, 474 F.2d 603 (9th Cir. 1973). Intent need not be established by direct evidence, but may be inferred from the defendant's statements and conduct. *Elbel v. United States*, 364 F.2d 127 (10th Cir. 1966).

■ One who acts with reckless indifference to whether a representation is true or false is chargeable with knowledge of its falsity. *United States v. Love*, 535 F.2d 1152 (9th Cir. 1976). Deceitful statements of half-truths or the concealment of material facts is actual fraud under the statute. *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967).

■ The government sustains its burden if it shows beyond a reasonable doubt either: (1) that the defendants knowingly made false representations or (2) that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension. *Irwin v. United States*, 338 F.2d 770, 773 (9th Cir. 1964).

■ Each appellant asserts he had an honest belief that the company would eventually succeed. While good faith is a defense to mail fraud, an honest belief in the ultimate success of an enterprise is not, in itself, a defense. *United States v. Diamond*, 430 F.2d 688, 691 (5th Cir. 1970).

■ In addition, each appellant contends that some of the representations which were found fraudulent were not. The government need not prove each allegation of fraud. Proof of any one or more of the fraudulent representations is sufficient. *United States v. Outpost Development Co.*, 552 F.2d 868, 869–70 (9th Cir. 1977).

D. *Proof of Conspiracy.*

■ To prove a conspiracy, the evidence must show that each of the appellants was involved. A meeting of the minds must be demonstrated. *United States v. Peterson*, 549 F.2d 654 (9th Cir. 1977). Mere association and activity with a conspiracy is insufficient. *United States v. Basurto*, 497 F.2d 781, 793 (9th Cir. 1974). However, a formal agreement between the appellants is not necessary. *United States v. Camacho*, 528 F.2d 464, 469 (9th Cir. 1976).

■ The agreement may be inferred from the appellants' acts pursuant to the fraudulent scheme or other circumstantial evidence. *United States v. Anderson*, 532 F.2d 1218 (9th Cir. 1976).

■ During the company's existence, some appellants joined and others withdrew from the enterprise. Nevertheless, the scheme was a single ongoing conspiracy. "[E]ach participant in the conspiracy need not know what other participants are doing, or why." *United States v. Jones*, 425 F.2d 1048, 1051 (9th Cir. 1970). Once a conspiracy is proved, "slight evidence is all that is required to connect a defendant with the conspiracy." *Diaz-Rosendo v. United States*, 357 F.2d 124, 130 (9th Cir. 1966). Moreover, while each conspirator is part of the conspiracy, he is responsible for his co-conspirators' acts committed pursuant to and in furtherance of the conspiracy. *United States v. Murray*, 492 F.2d 178, 187 (9th Cir. 1973).

E. *The Role of the Appellants in the Scheme.*

 It is clear from the record that numerous misrepresentations were made. The crucial question is whether there was sufficient evidence to link the individual appellants with the scheme for which these representations were made. We conclude there was.

1. *Appellants Rogers and Hennig.*

The record contains ample evidence that Rogers and Hennig participated in a scheme to mislead inventors. From the time he joined the company in December 1971, Rogers played a key role both in advertising and training salesmen. As the chief of contract sales, he was in charge of all advertising. He was responsible for the approval or preparation of numerous advertisements which misrepresented the company's achievements and capabilities.

He played a crucial role in the preparation of the pamphlet which reproduced the article and photo of Fortado receiving a purported "advance royalty" check. He approved and had ultimate responsibility for the first brochure which depicted the Union Bank Building and contained other misrepresentations.

Rogers took over "Product Placement" in October 1972. In this position, he signed the complaint on behalf of NAA in its 1973 suit for rescission. He informed DMI customers that NAA had no legal obligation to them when he knew DMI and NAA were really the same company. Rogers participated in sales seminars, trained salesmen and sent memoranda to salesmen stating that the company had successfully placed inventors' products when in fact it had not done so. The evidence was more than sufficient to sustain his conviction.

Although Hennig was with the company only from the spring of 1972 to December 1973, his participation in the scheme is well documented. He replaced Rogers as chief of contract sales in October 1972 and was responsible for training and supervising salesmen and training regional sales managers.

Like Rogers, Hennig represented to DMI customers that NAA was a separate company not legally bound to them. He sent memoranda in 1973 to salesmen stating falsely that inventors' products had been placed, and encouraged the salesmen to use these memoranda. He also approved a "sales pitch" representing that inventors risked only $150 for a 45-day preliminary evaluation. These evaluations were conducted in ten minutes, and no product was ever rejected after the evaluations.

Hennig approved and prepared other advertising, including a promotional film containing misrepresentations similar to those in the earlier advertisements prepared under Rogers' direction. It was shown to inventors at the San Diego sales office and to at least one other sales office.

Reviewing this evidence in the light most favorable to the government, we find it sufficient to demonstrate that Hennig acted at least with "reckless indifference" as to whether these representations were true or false, *United States v. Love, supra.* Moreover, we find that the representations were, at best, deceitful statements of half-truths. *Lustiger v. United States, supra.* We affirm his conviction.

2. *Appellant Beecroft.*

Beecroft contends that the majority of misrepresentations were in advertisements before he joined the company and that the evidence was insufficient to prove specific intent on his part to participate in the scheme. We disagree.

After he became involved in the invention promotion business in November 1972, he reviewed all the product literature and personally made changes in the advertising material. Nevertheless, he allowed one of the brochures (Govt. Ex. 6A) to be used during his association with the company. It contained both the photo and many of the misrepresentations of the first brochure. In addition, advertisements prepared while Beecroft was chairman of NAA–DMI contained representations which, albeit less blatant than those in the earlier literature,

nevertheless could be regarded by the trier of fact as "half-truths," deceptive to the public. Similar representations were made in the promotional film.

Representations that DMI was a successful company with an enviable record and a highly qualified staff were made in newspaper advertisements, and DMI brochures. Beecroft asserts that these were true. Reviewing the evidence in a light most favorable to the government, the court's conclusion that the representations were deceptive and that Beecroft acted with reckless indifference as to their truth or falsity must be sustained.

The question of Beecroft's intent is clearly answered in the testimony of Frank Maxfield, project manager at DMI. Maxfield testified that Beecroft instructed him to conceal from the salesmen the fact that the $1,500 and $1,800 portfolio contracts were treated in the same way. Beecroft knew the salesmen and believed they would represent to the public that the two types of contracts would be treated differently. He participated in the suit by NAA against DMI, was aware that duplicate inventions were being accepted, and knew that the 45-day evaluations were not being conducted so that the client truly was risking the entire $1,500 or $1,800 fee rather than $150, as represented. There was sufficient evidence of Beecroft's intent and participation to affirm his conviction.

3. *Appellant Harrison.*

Harrison contends that the trial court improperly denied his Rule 29 motion for judgment of acquittal at the close of the government's case. On review of the denial of that motion, we view the evidence and all reasonable inferences therefrom in the light most favorable to the government. *Glasser v. United States, supra.* Applying that standard, we find the court's denial of the motion was proper.

Harrison concedes that there was a fraudulent scheme, but claims there was insufficient evidence of either his knowledge of, or his participation in the scheme. He relies on *United States v. McDonald,* 576

F.2d 1350 (9th Cir. 1978). Appellant Harrison, unlike McDonald, had specific knowledge of the fraudulent way the business was being conducted.

Harrison founded DMI after leaving another company engaged in the same sort of fraudulent business. He participated in some of the meetings when deceptive advertising brochures were discussed and approved, including the meeting at which the photo of the Union Bank Building was discussed. Charles Attal, who handled DMI's advertising, testified that everyone at that meeting was enthusiastic about making the building look like DMI's headquarters. The decision to eliminate the name of the building was unanimously approved.

Harrison attended subsequent meetings when other portions of the first brochure were discussed and approved. It is apparent that Harrison knew misleading and fraudulent representations were being made. He expressed no disapproval and took no action to prevent the dissemination of these misrepresentations. Although he may have had no formal control of the advertisements, as a corporate officer he had the authority to question them.

Occasionally, Harrison participated in the preparation of portfolios. In December 1972 he admitted to a DMI employee that the portfolio service had gone downhill and that he was ashamed of the portfolios. He said that he felt the client was not getting what he paid for and that few, if any, products were ever placed. Harrison was in a position to make such observations because he handled inventor complaints and negotiated settlements of them.

Harrison was aware of what was happening. His "[i]ntent to defraud may be inferred from [his] knowledge that the scheme operated in a deceitful manner." *United States v. Piepgrass,* 425 F.2d 194, 199 (9th Cir. 1970); *accord, Phillips v. United States,* 356 F.2d 297 (9th Cir. 1966).

Harrison's guilt is further demonstrated by his participation in some of the company's other deceptions. He signed the check for Fortado's "advance royalty". He dis-

cussed the deceptive NAA suit against DMI in a letter to attorney Robert Croissant who represented a dissatisfied DMI client, indicating that the companies were separate and that officers of DMI had made misrepresentations to officers of NAA.

He acknowledged by letters to inventors their payments of the $1,500 or $1,800 fee. In a "Newsletter to Inventors," he said that the company's division in charge of placement had "achieved the distinction of being one of the most successful product placement firms in the world today." He knew this was false but contends this was an insignificant statement made at the end of the letter. We cannot agree.

■ From the evidence presented by the government, we find the court's denial of Harrison's Rule 29 motion for acquittal was proper. The proof demonstrated his knowing involvement in the fraudulent scheme. *Lustiger v. United States, supra.*

Harrison offered no evidence in his own behalf and he concedes that if the evidence at the close of the government's case was sufficient to sustain his conviction, it would suffice to sustain his conviction following the introduction of evidence on behalf of the other defendants and the government's rebuttal. The evidence at the close of the government's case was sufficient and we affirm his conviction.

## II.

### ADMISSION OF THE DUN AND BRADSTREET REPORT

Harrison claims that the admission of a Dun and Bradstreet report was erroneous because it was hearsay and because his signature was not authenticated. The government's evidence demonstrated that the stated assets of the report were inflated and the stated liabilities were deflated. The report indicated that its figures came from a financial statement signed by Harrison and submitted to Dun and Bradstreet.

The foundation for offering the report was established by the testimony of Goff and Raymond Mahony, the local Dun and Bradstreet representative. Goff testified that all financial information from DMI's books would have to come from Harrison. Mahony testified that he had been approached by DMI's Ron Brown who asked him to issue a Dun and Bradstreet report more favorable than its previous one. Mahony said that Brown gave him a financial statement signed by Harrison and explained that the figures from it were transferred to the Dun and Bradstreet report. The original statement was later destroyed in keeping with Dun and Bradstreet's regular business practices.

In disputing the admission of the report, Harrison first contends there was insufficient foundation to establish the authorship of the original financial statement. He asserts the signature was not authenticated because Mahony had never seen Harrison's signature.

We find no authentication issue. The original statement was not offered in evidence and the government did not need to authenticate it. The question whether Harrison's signature was on it is not one of admissibility but one of fact to be decided in part by circumstantial evidence that the Dun and Bradstreet report states his signature was there.

■ Authentication of the signature is not required "in special circumstances, where the contents reveal a knowledge . . . peculiarly referable to a single person, [since] . . . the contents alone may suffice" to establish genuineness. 7, J. Wigmore, Evidence, § 2148 (3d ed. 1940); *United States v. Wilson*, 532 F.2d 641, 645 (8th Cir. 1976).

Harrison argues that the report was inadmissible because it was hearsay. Hearsay is defined in Fed.R.Evid. 801(c) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

■ The offer of the contents of the report is not hearsay. The Dun and Bradstreet report was not introduced to prove the financial condition of DMI. It was

introduced to show Harrison's knowledge of the figures. The report was but a part of the circumstantial evidence illustrating Harrison's awareness of the misrepresentations made to inventors via the Dun and Bradstreet report.

■ We need not determine whether the report's specific reference to Harrison's signature on the financial statement was hearsay. Even if it were, it was properly admissible under the business records exception, Rule 803(6), which applies when two requirements are met: (1) the report is timely made in the course of a regularly conducted business activity, and (2) there is no indication of untrustworthiness.

The evidence meets the first requirement because Dun and Bradstreet regularly prepares such reports, and prepared this one promptly after it received the financial statement. The evidence is trustworthy because Dun and Bradstreet's function is preparing such reports. Commercial business relies on them. Dun and Bradstreet has a reputation for trustworthiness and nothing indicates that this report was prepared in an untrustworthy manner. Consequently, the second requirement has been met.

Other courts have found that credit reports fall within the business exception. In *United States v. DeFrisco*, 441 F.2d 137 (5th Cir. 1971), the court held that a credit bureau's report made in the course of the bureau's regular business activities was properly admitted.[2]

In *Missouri Pacific R.R. Co. v. Austin*, 292 F.2d 415 (5th Cir. 1961), the court specifically discussed the admissibility of Dun and Bradstreet reports:

Dun & Bradstreet, Inc. is in the business of compiling credit reports for use of commercial concerns. . . . These files and papers are regular records kept in the regular course of the business of Dun & Bradstreet. . . . The business of Dun & Bradstreet is preparing reports of this nature for transmission to other business concerns. Ordinarily peo-

ple in the trade place considerable reliance on the reports of Dun & Bradstreet.

292 F.2d at 420. The *Austin* court indicated that credit reports would ordinarily be admissible under the business records exception but held the particular reports were inadmissible because there was no evidence that the information had been recorded at or near the time of the interview. 292 F.2d at 422–23. The report in the instant case was prepared promptly after receipt of the financial statement and the business records exception applies.

The admission of the report was proper whether it was hearsay or not.

### III.

### BEECROFT'S SENTENCE

■ Beecroft was convicted of fewer substantive counts of mail fraud than were the other appellants but received a heavier sentence. He complains of the disparity and argues that there was no explanation for it. We disagree.

Although an explanation is required when the court gives disparate sentences, a formal statement of reasons is not necessary. *United States v. Capriola*, 537 F.2d 319, 321 (9th Cir. 1976). Beecroft relies on *Capriola* for his contention that his professional position as a lawyer is not, in itself, enough to justify a greater sentence. In *Capriola*, the appellant lawyer chose to go to trial on a charge of conspiracy to import marijuana. He was found guilty and received a significantly harsher sentence than the defendants who chose to plead guilty. The case was remanded to allow the trial judge to reconsider the sentence and to explain the disparity.

■ Remand is not required here. Unlike *Capriola*, the trial court in this case gave an explanation for Beecroft's sentence:

Mr. Beecroft . . . with his background and education, and with his abili-

---

2. The report was admitted under the federal Business Records Act, 28 U.S.C. § 1732, which contained the business exception before it was codified as Rule 803(6).

ty . . . bore the responsibility from that day forward [for] taking over and cleaning up the corporation . . . [G]iven our positions in life, we do with the knowledge of what we can do . . I can only say this to you, sir: if, as a lawyer, I had been in the same position you had, I would have expected exactly the same sentence, and that was exactly the same criteria upon which I based my sentence.

This was a sufficient explanation for the sentence. A judge has wide discretion in determining the sentence to be imposed and may consider relevant facts in a defendant's personal history and occupation. *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); *United States v. Flores*, 540 F.2d 432 (9th Cir. 1976). The sentence imposed was well within the scope of the judge's discretion.

The judgment and sentences are affirmed.