**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Pantelis ANTONAKEAS, aka Alexx
Antaeus, Defendant–Appellant.**

No. 99–10002.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 13, 2000

Filed June 19, 2001

Elizabeth A. Fisher, Honolulu, Hawaii, for the appellant.

Thomas Muehleck, Assistant U.S. Attorney, Honolulu, Hawaii, for the appellee.

Before: HUG, TROTT, and WARDLAW, Circuit Judges.

HUG, Circuit Judge:

In 1993, Appellant Pantelis Antonakeas was arrested in California, where he lived at the time, and was brought to Hawaii to stand trial in U.S. district court for one count of conspiracy to distribute cocaine and two counts of possession of cocaine with intent to distribute. A jury convicted him of all three counts, and he was released on bail pending sentencing. However, instead of appearing for sentencing, Appellant fled the United States and remained at large until German authorities arrested him in 1997. The United States then secured his extradition.

Finding himself once again before the district court, Appellant moved to terminate the sentencing proceedings, arguing that the court lacked jurisdiction because the United States had failed to comply with certain procedural terms of the extradition treaty. The district judge rejected this argument and imposed sentence. Appellant now appeals the denial of his motion to terminate the proceedings. He also argues, for the first time on appeal, that the Vienna Convention was violated. Additionally, Appellant raises numerous issues relating to his trial and sentencing: (1) constructive amendment of the indictment; (2) fatal variance; (3) insufficiency of the evidence; (4) improper rebuttal testimony; (5) *Brady* violations; (6) improper venue; (7) erroneous refusal to give a mitigating role adjustment; and (8) erroneous sentencing based on a quantity of cocaine that was attributed to him by the sentencing judge rather than determined by the jury. We affirm the judgment entered by the district court.

**Factual Background**

After the jury returned its guilty verdict in Appellant's drug trial on September 8, 1993, Appellant was released on bail pending his sentencing, which was scheduled for January 18, 1994. Having fled the United States, Appellant failed to appear for sentencing. Accordingly, he was indicted on January 27, 1994, for failure to appear after having been released on bail, in violation of 18 U.S.C. § 3146.

German authorities arrested Appellant at the Munich Airport on August 14, 1997. He has dual nationality and was traveling on his Greek passport at the time. The U.S. Department of Justice ("DOJ") asked

the U.S. State Department to cable the U.S. Embassy in Germany and request that German officials arrest and extradite Appellant for both the drug conviction and the indictment for failure to appear. In its request to the State Department, the DOJ referred to the 1978 extradition treaty[1] between the United States and Germany, and the DOJ assured that it would "provide the supporting documents required under the treaty within the time specified by the treaty."

German officials ultimately approved Appellant's extradition for the drug conviction but denied it for the failure-to-appear indictment.[2] Appellant was turned over to U.S. authorities, and on March 18, 1998, he was again brought before the United States District Court for the District of Hawaii. Appellant objected to the district court's assertion of jurisdiction based on an alleged procedural violation of the Treaty.[3] On December 14, 1998, after receiving briefing on the issue, the district court denied Appellant's motion to terminate the proceedings and sentenced Appellant to 168 months of incarceration and five years of supervised release on each count, all to run concurrently.

Originally in the district court, Appellant was charged with conspiracy to distribute a quantity of cocaine in excess of 500 grams[4] (Count 2) and with possession with intent to distribute a quantity of cocaine in excess of 500 grams[5] (Counts 3 and 4). The organizer of the conspiracy, co-defendant Vassilios Liaskos, was a Honolulu resident who distributed there each month

multiple kilograms of cocaine that he received from several suppliers. Much of the cocaine was transported to Liaskos by Sergio Panagiotopoulos, Cyriakos Cyzeridis, and Hristos Vasuras—who testified at trial that Appellant had sold, supplied, or attempted to supply them with cocaine on numerous occasions. The "ways and means" section of Count 2 alleged that, in order to achieve the objectives of the conspiracy, Appellant (among several others) "from 1987, and continuing through 1992 ... obtained kilogram quantities of cocaine in California for delivery to VASSILIOS LIASKOS in Honolulu, Hawaii." Counts 3 and 4 also stated that the defendants knew and intended that the cocaine would be distributed in Hawaii.

During deliberations, the jury sent out a note asking, "To be part of this conspiracy charge (count # 2) does the defendant need to have the knowledge that the cocaine was to be ultimately sold [and] distributed in Hawaii?" The district judge responded: "The answer to that question is no. The elements of the conspiracy that the government is required to prove beyond a reasonable doubt are set forth in Court's Instruction No. 21 and the indictment." The court's instructions did not include the Hawaii nexus with regard to either the conspiracy count or the possession-with-intent-to-distribute counts.

Appellant argues that the Hawaii nexus of each count was critical and that omitting the Hawaii nexus (1) constituted a constructive amendment to the indictment, (2)

---

1. Treaty between the Federal Republic of Germany and the United States of America Concerning Extradition, June 20, 1978, U.S.-F.R.G., 32 U.S.T. 1485. ("Treaty").

2. As a result, the district court granted the government's motion to dismiss the indictment for failure to appear.

3. Appellant contended that supporting documentation required by the Treaty was turned over after the deadline set forth in Article 15 of the Treaty.

4. In violation of 21 U.S.C. §§ 846, 853.

5. In violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

resulted in a fatal variance between the indictment and the evidence, and (3) resulted in the government failing to prove his involvement in the conspiracy.

Appellant also argues that the district court erred in denying his motion for a mistrial, which contended that he was prejudiced by the government's rebuttal case. On direct examination during the defense's case, Appellant denied any involvement in the sale or use of drugs. He claimed to be an aspiring music remixer and testified, "we do not tolerate any drug abusers or users in our business." In rebuttal, the prosecution called Panagiotopolous, a major participant in the conspiracy, who testified to two non-indicted cocaine sales made to him by Appellant.

Appellant also makes two allegations of *Brady* violations, for which he also moved for a mistrial in the district court. First, he contends that the government should have produced a DEA agent's debriefing report for Panagiotopolous. After being arrested, Panagiotopolous attempted to negotiate a plea agreement with the government. It took several months for Panagiotopolous to reach an agreement because the government initially did not believe that he was telling the truth. Relying on the fact that the government did not initially believe Panagiotopolous, Appellant argues that Panagiotopolous's statements, made during the plea negotiations and summarized in the report, were *Brady* material. The district court rejected this argument and denied a mistrial.

Second, Appellant contends that the government should have disclosed that government witness Cyzeridis had tried to bribe another government witness, Vasuras. The district court denied the defense motion for a mistrial, holding that the government had no obligation to disclose anything in reference to Cyzeridis.

Additionally, Appellant argues that venue was not proper in Hawaii and that the sentencing judge erred in denying him a mitigating role adjustment. And, finally, we construe a letter filed by Appellant pursuant to Rule of Appellate Procedure 28(j) as arguing that he was sentenced, in violation of the rule announced in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), on the basis of a quantity of cocaine that was not determined by the jury, but rather by the judge at sentencing.

## Discussion

### 1. Standing to Raise Procedural Violations of an Extradition Treaty

■ The United States argues that Appellant has no standing to raise noncompliance with procedural provisions of the Treaty as a bar to jurisdiction in the district court. We agree. An early Supreme Court case, *United States v. Rauscher*, 119 U.S. 407, 409–10, 430, 433, 7 S.Ct. 234, 30 L.Ed. 425 (1886), recognized the right of a person extradited to enforce what has become known as a "specialty" provision in a treaty-a requirement that the receiving country may proceed against the person extradited only for offenses that are enumerated in the treaty and upon which extradition actually rested. In *Rauscher*, the treaty enumerated murder as an eligible offense, and extradition rested on that offense, but the defendant was tried and convicted for the then-existing lesser offense of "cruel and unusual punishment." *Id.* at 409–10, 7 S.Ct. 234. The Supreme Court reversed. *Id.* at 433, 7 S.Ct. 234. A more recent Supreme Court case, *United States v. Alvarez–Machain*, 504 U.S. 655, 659–60, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992), expressed agreement that a defendant may not be prosecuted in violation of the terms of an extradition treaty, citing *Rauscher*. But there the Court held that

a treaty could not be violated where it was not invoked (because the defendant had in fact been kidnapped, not extradited). *Id.* at 669–70, 112 S.Ct. 2188. In *United States v. Najohn,* 785 F.2d 1420, 1422 (9th Cir.1986) (per curiam), another specialty case, this court made the broad statement that "the person extradited may raise whatever objections the rendering country might have." Despite this broad pronouncement, however, we conclude that, unlike the substantive right of specialty, procedural violations do not give rise to individually enforceable rights.

"Whether or not treaty violations can provide the basis for particular claims or defenses ... depend[s] upon the particular treaty and claim involved." *United States v. Lombera–Camorlinga,* 206 F.3d 882, 885 (9th Cir.2000) (en banc), *cert. denied,* 531 U.S. 991, 121 S.Ct. 481, 148 L.Ed.2d 455 (2000). Unlike specialty, which is a substantive requirement that goes to the heart of the requested country's decision to allow extradition, a deadline is a procedural requirement without similar import. If a deadline is missed during the extradition process, the requested country can simply refuse extradition on that ground. By contrast, once the person sought has been turned over to the requesting country for specified offenses, the requested country has no recourse if the offenses ultimately charged are different from the offenses upon which extradition was allowed. For this reason, it is necessary to allow the person extradited to raise this type of treaty violation in the requesting country because the requested country has no opportunity to enforce the specialty provision on its own behalf.[6] If the authorities in Germany believed that there was a treaty violation, they could have refused extradition. There is no policy reason to accord Appellant standing to raise in the district court an alleged missed extradition deadline after Germany has determined that the treaty provisions were fulfilled and extradition was proper.

### 2. Vienna Convention

■ Appellant contends that his detention violated the Vienna Convention because he was not informed of his right to contact the Greek Consulate in Germany and because the Greek Consulate was not contacted about his detention.[7] He argues that this failure prejudiced him with regard to challenging extradition. Appellant

---

6. Because of this practical difference, our decision today does not conflict with the broad pronouncement in *Najohn* that the person extradited may raise "whatever objections the rendering country might have." 785 F.2d at 1422. Having turned over Appellant despite an alleged procedural violation, Germany has indicated by its actions that it has no objection; thus, there is nothing for Appellant to raise.

7. Article 36 of the Vienna Convention provides:

 1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

 * * *

 (b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.*

Vienna Convention on Consular Relations, Apr. 24, 1963, art. 36, 21 U.S.T. 77, 596 U.N.T.S. 261 (emphasis added).

did not raise the Vienna Convention argument in the district court.

■ As a general rule, this court will not consider an issue raised for the first time on appeal. *Bolker v. Commissioner,* 760 F.2d 1039, 1042 (9th Cir.1985); *United States v. Greger,* 716 F.2d 1275, 1277 (9th Cir.1983). There are three exceptions to this rule:

> if (1) there are "exceptional circumstances" why the issue was not raised in the trial court, (2) the new issue arises while the appeal is pending because of a change in the law, or (3) the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court.

*United States v. Flores–Payon,* 942 F.2d 556, 558 (9th Cir.1991); *United States v. Carlson,* 900 F.2d 1346, 1349 (9th Cir. 1990). None of the exceptions applies. No exceptional circumstances have been alleged. There has been no change in the law. And the issue presented is heavily dependent on the facts, which have not been developed. We therefore decline to review Appellant's claim that the Vienna Convention was violated.

*3. Constructive Amendment of the Indictment*

■ In this case, Appellant's constructive amendment, variance, and insufficiency of the evidence arguments all boil down to the ultimate issue of sufficiency of the evidence. The Fifth Amendment's grand jury requirement establishes the "substantial right to be tried only on charges presented in an indictment returned by a grand jury." *United States v. Miller,* 471 U.S. 130, 140, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985) (quoting *Stirone v. United States,* 361 U.S. 212, 217, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960)). "An indictment is amended when it is so altered as to charge a different offense from that found by the grand jury." *Id.* at 144–45. Appellant's constructive amendment challenge is based upon the assertion that "[a] defendant indicted for involvement with a specific conspiracy with a Hawaii nexus cannot be convicted on *that* indictment of involvement with either a general conspiracy with no particular nexus or an isolated drug sale extrinsic to the charged conspiracy."

The Supreme Court discussed constructive amendment at length in *Miller:*

> Convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment. A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as "a useless averment" that "may be ignored." *Ford v. United States,* 273 U.S. 593, 602, 47 S.Ct. 531, 71 L.Ed. 793 (1927).

471 U.S. at 136. Miller's indictment for mail fraud alleged that he (1) consented to a burglary of his business and (2) lied to his insurance company about the value of his loss. *Id.* at 130. His conviction was upheld, even though the proof at trial only addressed lying about the value of the loss. *See id.* at 132, 145. The allegation in the indictment about consenting to the burglary was surplusage. *Id.* at 145.

The *Miller* Court distinguished the situation where an indictment charges a certain act, but a different act is actually proven, thus "broadening" the bases for conviction to acts beyond those charged in the indictment. *See id.* at 139 (discussing *Stirone,* in which the indictment alleged obstruction of *sand* shipments *into* Pennsylvania but the proof showed obstruction of *steel* shipments *out of* Pennsylvania).

■ In this case, Appellant contends that the grand jury indicted him for a

conspiracy to distribute cocaine in Hawaii but the proof at trial failed to connect him to Hawaii. As in *Miller*, however, even if Appellant were correct that the Hawaii nexus was read out of the indictment, "what was removed from the case was in no way essential to the offense on which the jury convicted."[8] *Id.* at 145. Therefore, the government did not constructively amend Appellant's indictment. And, as discussed below, the government did in fact connect Appellant to the single conspiracy to supply Liaskos with cocaine for distribution in Hawaii.

### 4. Variance

"A variance occurs when the proof introduced at trial differs materially from the facts alleged in the indictment." 3 Charles Alan Wright, *Federal Practice and Procedure*, Criminal § 516 (2d ed.1982). The distinction between an amendment to an indictment and a variance is blurred:

> The *Stirone* rule, treating a variance as a constructive amendment of the indictment or information and assuming it to be prejudicial, has been limited to cases in which the prosecution presents a complex of facts distinctly different from that set forth in the charging instrument and not applied where there is a single set of facts. If there is only a single set of facts, and the matter is considered to be only a variance rather than a constructive amendment, the variance is reversible error only if it has affected substantial rights, and *is not fatal unless*

> *the defendant could not have anticipated from the indictment what evidence would be presented at trial ....*

*Id.* (emphasis added).

■ As discussed below, the government's proof concerned only a single set of facts: the supplying of cocaine to Liaskos for distribution in Hawaii. Moreover, Appellant could anticipate the evidence that would be presented at trial, and he conducted his defense appropriately. Our opinion in *United States v. Tsinhnahijinnie*, 112 F.3d 988 (9th Cir.1997), illustrates the type of extreme facts required for fatal variance to be found. In *Tsinhnahijinnie* the defendant was indicted for sexual abuse of a child occurring on an Indian reservation during the summer of 1992. *Id.* at 989. However, the child's testimony fluctuated between placing the abuse at the place and time in the indictment and placing it off the reservation in 1994. *Id.* at 990. Because the evidence adduced at trial differed significantly from the allegations in the indictment, we held that the indictment had not given the defendant adequate notice of the crime charged. *Id.* at 992. And the evidence that was produced as to the indicted crime was insufficient. *Id.*

Unlike in *Tsinhnahijinnie*, the evidence adduced and theories asserted at Appellant's trial covered the facts and time frame alleged in his indictment. Thus his case is distinguishable from those in which a fatal variance has been found. *See also*

---

**8.** On these facts Appellant cannot avail himself of the rationale of cases like *United States v. Cancelliere*, 69 F.3d 1116 (11th Cir.1995), which he cites. In *Cancelliere* the indictment charged willful money laundering, and the defendant's sole defense was that he acted honestly but mistakenly. *See id.* at 1120–21. In submitting the case to the jury, the trial judge deleted the willfulness requirement, and the court of appeals reversed. *See id.* at 1121–22. Here, however, Appellant did not defend on the ground that his cocaine conspiracy did not concern Hawaii, rather, he denied selling drugs at all. Because *Cancelliere* relied heavily on the fact that the only defense presented concerned willfulness, it is more analogous to the variance opinions discussed below. *Cancelliere*'s "broadening" language is thus unnecessary, for the case actually turned on the defendant not being given fair notice of the charge against which he must defend.

*Jeffers v. United States,* 392 F.2d 749, 752–53 (9th Cir.1968) (reversing convictions due to fatal variance where indictment alleged that money collected from followers of religious group was used for non-religious purposes; evidence failed to prove that use was non-religious, instead showing only that use was contrary to representations made when money was collected).

Appellant argues a second variance theory, stemming from *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), that the government proved multiple conspiracies under an indictment alleging only a single conspiracy. However, the government's theory throughout this case was that Appellant was part of a single conspiracy to supply Liaskos with cocaine for distribution in Hawaii. The government did not prove multiple conspiracies; it connected everything back to Liaskos and Hawaii. Thus, *Kotteakos* is inapplicable. *See United States v. O'Connor,* 737 F.2d 814, 822 (9th Cir.1984) ("Under our precedent, *Kotteakos* is inapplicable if ... the evidence supports a finding that the charged conspiracy exists."); *United States v. Moore,* 522 F.2d 1068, 1074 (9th Cir.1975) (rejecting *Kotteakos* argument because appellant "was not subjected to the danger that he might be convicted on the basis of evidence that related only to a conspiracy of which he was not a part"). Therefore, Appellant's claim boils down to an argument that the government did not connect him to the single conspiracy that it proved. *See United States v. Duran,* 189 F.3d 1071, 1078 (9th Cir.1999) ("The issue of whether a single conspiracy has been proved is a question of the sufficiency of the evidence.").

### 5. Sufficiency of the Evidence

 Claims of insufficient evidence are reviewed de novo. *Duran,* 189 F.3d at 1078. The government proved beyond question that a conspiracy existed to supply Liaskos with cocaine to be distributed in Hawaii, and Appellant does not argue otherwise. Instead, he contends that the evidence was sufficient to convict him only of isolated sales of cocaine, not to connect him to the conspiracy. We disagree. "Evidence is sufficient to connect a defendant to a conspiracy if it shows that the defendant had knowledge of and participated in the conspiracy." *Id.* at 1078. In other words:

> "The government need not show direct contact or explicit agreement between the defendants. It is sufficient to show that each defendant knew *or had reason to know* of the scope of the conspiracy and that each defendant *had reason to believe* that [his] own benefits were dependent on the success of the entire venture."

*United States v. Montgomery,* 150 F.3d 983, 999 (9th Cir.1998) (quoting *United States v. Kostoff,* 585 F.2d 378, 380 (9th Cir.1978)). Furthermore, "[o]nce the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the connection is slight, is sufficient to convict him with knowing participation in the conspiracy." *United States v. Dunn,* 564 F.2d 348, 357 (9th Cir.1977).

Testimony before the jury attributed to Appellant the sale or attempted sale of numerous kilograms of cocaine to Cyzeridis and Vasuras who immediately carried the cocaine to Liaskos in Hawaii via commercial airline flights. These are overt acts in furtherance of the conspiracy if the government connected Appellant to it. The government did.

Phone records reflecting calls made from Liaskos's apartment in Honolulu to

Appellant's house in Los Angeles were admitted into evidence. The government also elicited testimony from Vasuras that Appellant stated in February of 1990 that he knew that the cocaine he supplied was being taken to Hawaii. Vasuras then testified that Appellant sold and attempted to arrange sales of cocaine after February of 1990; i.e., after Appellant knew that the cocaine was destined for Hawaii. This evidence is sufficient for a reasonable juror to conclude that Appellant realized the scope of the conspiracy as well as the dependence of his own continued benefits on the success of the conspiracy.[9]

### 6. The Government's Rebuttal Case

■ Admission of rebuttal evidence is reviewed for abuse of discretion. See Jackson v. Calderon, 211 F.3d 1148, 1165 n. 9 (9th Cir.2000), cert. denied, 121 S.Ct. 764 (2001); United States v. Gonzalez–Rincon, 36 F.3d 859, 865 (9th Cir.1994).

■ Appellant contends that Pangiotopoulos's testimony—that Appellant had sold him cocaine on two occasions—went beyond the proper scope of rebuttal. The government responds that Appellant, on direct examination during the defense case-in-chief, opened the door for rebuttal by making sweeping denials of any involvement in drugs. We agree that this was proper impeachment by contradiction. Federal Rule of Evidence 607 allows the admission of extrinsic evidence to impeach specific errors or falsehoods in a witness's testimony on direct examination. United States v. Castillo, 181 F.3d 1129, 1133 (9th Cir.1999). In Castillo, the defendant, on direct examination, testified that he worked with disadvantaged children and would not smuggle drugs "for a million dollars" and portrayed himself as an anti-

drug counselor who taught kids to stay away from drugs. Id. at 1132. After this sweeping denial, the district court allowed the government to call a rebuttal witness to impeach the defendant with testimony about his prior arrest for cocaine possession. Id. This court affirmed and explained:

> Rule 608(b) prohibits the use of extrinsic evidence of conduct to impeach a witness' credibility in terms of his general veracity. In contrast, the concept of impeachment by contradiction permits courts to admit extrinsic evidence that specific testimony is false, because contradicted by other evidence:
>
> > Direct-examination testimony containing a broad disclaimer of misconduct sometimes can open the door for extrinsic evidence to contradict even though the contradictory evidence is otherwise inadmissible under Rules 404 and 608(b) and is, thus, collateral. This approach has been justified on the grounds that the witness should not be permitted to engage in perjury, mislead the trier of fact, and then shield himself from impeachment by asserting the collateral-fact doctrine.
> >
> > 2A Charles A. Wright & Victor J. Gold, Federal Practice and Procedure, § 6119 at 116–17 (1993).
>
> Id. at 1132–33.

In his direct examination Appellant held himself out as a legitimate remixer in the music industry. He said that drugs are "absolute[ly] not" accepted in that industry. He explained that in the '60s and '70s "a lot of careers were ruined and a lot of companies fell apart because of drug addiction ... so in the '80s the music business has been very, very careful about drugs and remove all—refuse to work with

---

9. Appellant also argues that misleading jury instructions require reversal. This appears to be another way of saying that the district judge was required to instruct as to the Hawaii nexus. We have already rejected this contention.

any people that might be involved in any extent with drugs." He finished, "we don't tolerate any drug abusers or users in our business. So the '80s have been very, very clean as far as usage of drugs in the music business." With these sweeping statements disavowing any involvement with drugs, Appellant opened the door to the government's use of Panagiotopolous in rebuttal. *Castillo,* 181 F.3d at 1134; *cf. United States v. Beltran–Rios,* 878 F.2d 1208, 1212–13 (9th Cir.1989) (defendant cross-examined government witnesses about whether he had the accouterments of wealth one might expect of a drug dealer; government allowed to call expert to testify that drug couriers are generally not wealthy); *United States v. Bailleaux,* 685 F.2d 1105, 1110 (9th Cir.1982) (defendant opened door by testifying about prior conviction on direct; government allowed on cross-examination to introduce evidence of the underlying facts of that conviction to rebut inference of innocence). The district court did not abuse its discretion by allowing the prosecution to impeach Appellant's broad denial of any involvement in drugs.

### 7. *Alleged* Brady *Violations*

■■■■■ A district court's denial of a new trial motion based on alleged *Brady* violations is reviewed de novo. *United States v. Howell,* 231 F.3d 615, 624 (9th Cir.2000). To prevail on a *Brady* claim,[10] the defendant must show that "(1) the evidence was exculpatory or impeaching; (2) it should have been, but was not produced; and (3) the suppressed evidence was material to his guilt or punishment." *Paradis v. Arave,* 130 F.3d 385, 392 (9th Cir.1997). Evidence is material under *Brady* only if there is a reasonable probability that the result of the proceeding would have been different had it been dis-

closed to the defense. *United States v. Service Deli, Inc.,* 151 F.3d 938, 943 (9th Cir.1998); *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). *Brady* encompasses impeachment evidence as well as exculpatory evidence. *Id.* at 676, 105 S.Ct. 3375; *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The prosecution's obligation to disclose evidence favorable to the defense turns on the cumulative effect of all such evidence suppressed by the government. *Kyles v. Whitley,* 514 U.S. 419, 436–37, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Moreover, this obligation is independent of whether, at the time, the prosecutor knew of the favorable evidence or appreciated its significance. *See id.* at 437–38 (rejecting arguments that prosecutor should not be held accountable for information known only by the police and that it is difficult to realize what might become important later).

■■■■ Appellant contends that the government violated *Brady* by failing to disclose a DEA agent report summarizing post-arrest statements made by witness Sergio Panagiotopoulos. He argues that he was prejudiced because the reports show that inconsistent statements were made by Panagiotopoulos during six months of plea negotiations. The district court rejected this argument and denied a mistrial when the government explained that it had initially thought that Panagiotopoulos was lying to protect his wife. The government originally believed that Panagiotopoulos's wife had participated in the conspiracy; however, it later concluded that she had not and that Panagiotopoulos had been truthful from the start about her lack of involvement. The district court concluded that the statements were not

---

**10.** For a comprehensive discussion of the evolvement of the *Brady* rule and its applica-

tion, see *Kyles v. Whitley,* 514 U.S. 419, 434–41, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

*Brady* material because the government's mistrust did not concern Panagiotopoulos's testimony incriminating his co-conspirators. The district court also rejected an argument that Panagiotopoulos's initial failure to implicate his co-conspirators rendered those statements *Brady* material because they contradicted, by omission, his later statements that did implicate his coconspirators. After in camera review of the report, the district judge found:

> The court is unpersuaded that the failure to disclose the report constitutes a *Brady* or *Giglio* violation. The report is devoid of any material or exculpatory content, but rather merely reveals a witness (Sergio) cooperating with the government in an increasing manner. It is unsurprising that Sergio became increasingly cooperative with the discovery of additional evidence. Moreover, nothing in Sergio's prior statements exculpates defendants. The court is satisfied that the report is therefore not inconsistent with Sergio's testimony at trial and need not have been disclosed by the government.

 Appellant also contends that the government violated *Brady* by failing to disclose that government witness Cyzeridis attempted to bribe another government witness, Vasuras. Appellant argues that he was prejudiced because the bribe came out on the cross examination of Vasuras after Cyzeridis had already testified; thus, he was unable to impeach Cyzeridis with it. The district court rejected this argument, which was argued at trial by counsel for co-defendant Liaskos, finding that "the evidence is absolutely clear that Cyzeridis said nothing about any bribery." The court found:

> Now, [Cyzeridis] could be the beneficiary of such bribe, because such testimony would probably benefit him in the Arizona case, but he didn't do anything.

He didn't ask for the bribe, he didn't join in the bribe; and that was testified to specifically by Mr. Vasuras, when I asked whether or not he was part of it. Absolutely not. . . . There was only one person who made a bribe, if he made a bribe, and that's Stephanidis. . . . Therefore, the government did not have an obligation to disclose, as would affect your ability to effective[ly] cross examine Cyzeridis.

The court then stated to counsel for Liaskos: "I also find, by listening to [Vasuras's attorney] that [his] statement to you . . . gave you an opportunity to take great liberties and expansion from [his statement]—[he] was very clear when he said presence is all that there was, and he did not specifically say Cyzeridis."

Both of these alleged *Brady* violations are very fact-specific, and the district court, who is in a better position to evaluate the facts, found that Appellant's version of the facts is incorrect. The district court found that the DEA agent's report did not contain exculpatory information or inconsistent statements. The district court also found that Cyzeridis did not bribe Vasuras. Appellant has produced no evidence to undermine these factual findings by the district court. On the facts as determined by the district court, there was no error in rejecting Appellant's *Brady* arguments and denying a mistrial.

### 8. *Venue*

 "Venue for a conspiracy charge is appropriate in any district where an overt act committed in the course of the conspiracy occurred. It is not necessary that [the defendant] himself have entered or otherwise committed an overt act within the district, as long as one of his coconspirators did." *United States v. Angotti,* 105 F.3d 539, 545 (9th Cir.1997). This conspiracy was based in Honolulu, Hawaii, where

multiple kilograms of cocaine were distributed per month by Liaskos. Venue was therefore proper in the District of Hawaii.

### 9. Sentencing

■ Appellant argues that the trial court erred in not granting him a downward adjustment under United States Sentencing Guidelines § 3B1.2 for having a mitigating role. The district court's application of the Guidelines to the facts of a particular case is reviewed for an abuse of discretion. *United States v. Frega*, 179 F.3d 793, 811 n. 22 (9th Cir.1999). Under U.S.S.G. § 3B1.2(b), a defendant is entitled to a two-point downward adjustment as a "minor" participant if he is deemed "less culpable than most other participants but [his] role could not be described as minimal." U.S.S.G. § 3B1.2 cmt. n.3. If his role is so insignificant as to be considered "minimal," a four-point adjustment is warranted. U.S.S.G. § 3B1.2(a).

When sentencing Appellant, the sentencing judge determined that a supplier of kilogram quantities of cocaine on multiple occasions is not deserving of any downward adjustment. This is within the judge's discretion. A repeat supplier of kilogram quantities of drugs plays a significant role in a conspiracy to distribute those drugs.

### 10. Sentencing in Violation of Apprendi v. New Jersey

■ Appellant argues that the sentencing judge erroneously sentenced him on counts 2 and 3 on the basis of a quantity of cocaine not determined by the jury. We agree; however, because Appellant did not raise an objection to the error at the district court level we may not grant him relief unless the error is "plain." *United States v. Nordby*, 225 F.3d 1053, 1059–60 (9th Cir.2000). Under the "plain error" standard, Appellant must demonstrate

that: (1) there was "error"; (2) the error was "plain"; and (3) that the error affected "substantial rights." *Id.* If these conditions are met, we may exercise our discretion to notice the forfeited error only if the error (4) "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.*

It is clear that there was error. "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *United States v. Garcia–Guizar*, 234 F.3d 483, 488 (9th Cir.2000); *United States v. Nordby*, 225 F.3d 1053, 1057 (9th Cir.2000). The terms of incarceration mandated by statute for possessing cocaine with intent to distribute it are: 10 years to life for 5 kilograms or more of cocaine; 5 to 40 years for 500 grams or more of cocaine; and up to 20 years for cocaine and derivatives not falling under the prior two categories. 21 U.S.C. § 841(b). The sentencing judge found that 8 kilograms of cocaine were attributable to Appellant and sentenced him to 168 months (14 years) of incarceration.

■ Appellant was charged under Counts 3 and 4 of the indictment with violating 21 U.S.C. § 841(a)(1) by possessing with intent to distribute over 500 grams of cocaine. Although the jury convicted on both counts, the jury was specifically instructed that:

> The government is not required to prove that the amount or quantity of cocaine was as charged in the indictment. It need only prove beyond reasonable doubt that there was a measurable amount of cocaine.

We cannot look to the indictment to find the proper quantity for sentencing purposes. *See Nordby*, 225 F.3d at 1058–59. The jury found beyond a reasonable doubt only "a measurable amount of cocaine." This drug quantity exposed Appellant to a sentence of less than 20 years under 21 U.S.C. § 841(b)(1)(C). However, because the sentencing judge found that 8 kilograms of cocaine were attributable to him, Appellant was actually exposed to a life sentence under 21 U.S.C. § 841(b)(1)(A)(ii).

Therefore, the district judge's drug quantity determination violated *Apprendi* because it increased Appellant's exposure from 20 years to life. *See Nordby*, 225 F.3d at 1059; *see also Garcia–Guizar*, 234 F.3d at 488. Despite the district court's *Apprendi* error, Appellant's "substantial rights" were not affected because Appellant was actually sentenced to 14 years, which is within the statutory range as determined using the drug quantity found by the jury. *See Garcia–Guizar* at 488–89. Thus, although the sentencing judge's finding of drug quantity increased the statutory maximum penalty to which Appellant was exposed from 20 years to life, that increase had no effect upon the sentence that Appellant actually received. *Id.* Therefore, the error is not "plain" and Appellant is not entitled to relief.[11]

### Conclusion

For the reasons expressed above, Appellant's conviction and sentence are AFFIRMED.

---

11. To the extent that Appellant's Rule 28(j) letter can be interpreted as raising an *Apprendi* argument with regard to statutory mandatory *minimum* sentences, that argument is foreclosed by *United States v. Garcia–Sanchez,* 238 F.3d 1200, 1201 (9th Cir.2001).