# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

v.

RACHEL ALAFFA JERNIGAN,
   *Defendant-Appellant.*

No. 05-10086

D.C. No.
CR-00-01010-EHC

OPINION

Appeal from the United States District Court
for the District of Arizona
Earl H. Carroll, District Judge, Presiding

Argued and Submitted
December 7, 2005—San Francisco, California

Filed June 26, 2006

Before: Betty B. Fletcher, David R. Thompson, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Thompson;
Partial Concurrence and Partial Dissent by Judge B. Fletcher

## COUNSEL

John R. Hannah and Thomas M. Hoidal, Hoidal & Hannah, Phoenix, Arizona, for the defendant-appellant.

Michael T. Morrissey, Assistant U.S. Attorney, Phoenix, Arizona, for the plaintiff-appellee.

## OPINION

THOMPSON, Senior Circuit Judge:

Defendant Rachel Alaffa Jernigan appeals the district court's denial of her motion for a new trial. A jury convicted Jernigan on March 23, 2001, of having robbed a bank on September 20, 2000. After her conviction, Jernigan learned that someone with similar physical characteristics had robbed nearby banks in November of 2000 and December of 2001.

Based on this information, Jernigan filed a motion for a new trial in which she asserted that (1) the government violated her due process rights under *Brady v. Maryland*, 373

U.S. 83 (1963), by failing to disclose information prior to trial that was relevant to her defense, and (2) new evidence discovered after trial, when combined with the undisclosed pretrial evidence, mandates a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure ("Rule 33").

We have jurisdiction under 28 U.S.C. § 1291, and affirm the district court's denial of the motion for a new trial.

## I.  Background

### A.  September 20 Robbery and Conviction

The Bank of America branch at 15 E. Guadalupe Road in Gilbert, Arizona, was robbed on September 20, 2000. According to eyewitnesses, the robber was a short, Hispanic woman with a pock-marked face. She conducted a fairly generic robbery—she posed as a bank patron, quietly passed her assigned teller a demand note that threatened force, and absconded with the stolen proceeds without having said a word.

Working off a tip based on the robber's physical description, the FBI suspected Jernigan and assembled a six-woman photospread containing her picture. Two days after the robbery, the bank teller who had interacted with the robber (the "victim teller") viewed the photospread and identified Jernigan as the robber.

Police arrested Jernigan on November 10, 2000, and she has since remained in custody. The government charged Jernigan with the September 20 bank robbery, unlawful use of a firearm during that robbery, and two additional bank robberies on October 11 and 25. The district court severed the charges involving the September 20 robbery for trial.

Jernigan's three-day trial began on March 20, 2001. The evidence against her included five eyewitnesses who, both

prior to and during trial, identified her as the robber. There was also a surveillance video of the robbery which the jury watched four times. Jernigan's defense was that the witnesses misidentified her and she was not the robber shown in the surveillance video. The jury returned guilty verdicts on both counts (armed bank robbery and use of a firearm during an armed bank robbery). The district court sentenced Jernigan to 168 months in jail, and five years of supervised release. The other two bank robbery charges were dismissed by stipulation.

B.  *Evidence Known to the Government Before Trial: Potential* Brady *Evidence*

On November 28, 2000 (about three weeks after Jernigan had been arrested and placed in custody), someone robbed the bank across the street from the Bank of America branch in Gilbert, Arizona that Jernigan had been charged with robbing on September 20. The victim teller's physical description of the November 28 bank robber closely resembled the physical description of the September 20 bank robber: A short, "Hispanic or Oriental" female with "a little acne." The November 28 robbery was similarly generic, although the robber gave verbal instructions to the victim teller in addition to using a demand note.

On November 30, 2000, someone robbed a bank about 10 miles away from the two Gilbert banks. The victim teller described this robber as a short, Hispanic female with a pock-marked face. The robber conducted a generic robbery involving a demand note, and in addition gave the teller verbal instructions.

The government did not disclose any of this information to Jernigan prior to her trial. The authorities did not apprehend the suspect for the November 28 or November 30, 2000 robberies until approximately eight months after Jernigan's trial and conviction.

C. *Evidence Known to the Government Only After Trial:*
   *Potential Rule 33 Evidence*

On December 11, 2001 (over eight months after Jernigan's conviction), someone robbed the same bank that Jernigan had been convicted of robbing on September 20, 2000. This time, the victim teller was Kathleen Golliher, a bank employee who had also witnessed the September 20, 2000 robbery, and had given testimony as an eyewitness at Jernigan's trial. She told investigators that the December 11, 2001 robber was a short, Hispanic female.

Because Golliher placed a tracking device in the money stolen by the December 11, 2001 robber, and police had a description of the getaway vehicle, law enforcement officers stopped the suspect, Juanita Rodriguez-Gallegos, about half an hour after the robbery. During that stop, Golliher identified Rodriguez-Gallegos as the robber.[1] A police report described Rodriguez-Gallegos as a Hispanic female, 4′11″, 125 pounds, with brown eyes, black hair, and pock-marked cheeks.

The government charged Rodriguez-Gallegos with the November 28, 2000, November 30, 2000, and December 11, 2001 bank robberies, and with one count of brandishing a firearm during a violent crime. Rodriguez-Gallegos pleaded guilty to the firearm offense and the three bank robbery charges were dismissed.

D. *Motion for New Trial*

After hearing about Rodriguez-Gallegos from fellow inmates, Jernigan moved for a new trial on two grounds: (1) the government violated its *Brady* obligation prior to trial by failing to disclose that, about a month after Jernigan's alleged

---

[1]According to Golliher, the September 20, 2000 and December 11, 2001 robberies (both of which she witnessed) were committed by different women.

robbery, nearby banks had also been robbed by a then-unidentified robber whose physical description resembled Jernigan's; and (2) Rule 33 mandated a new trial in light of the post-trial developments involving Rodriguez-Gallegos. The district court held hearings and denied the motion for a new trial. This appeal followed.

## II.   *Analysis*

### A.   Brady *Claim*

**[1]** We review de novo the district court's denial of an alleged *Brady* violation. *United States v. Ogles*, 406 F.3d 586, 591 (9th Cir. 2005) (citing *United States v. Antonakeas*, 255 F.3d 714, 725 (9th Cir. 2001)). To prevail on a *Brady* claim, a defendant "must show that '(1) the evidence was exculpatory or impeaching; (2) it should have been, but was not produced; and (3) the suppressed evidence was material to his guilt or punishment.' " *Id.* (quoting *Antonakeas*, 255 F.3d at 725). Evidence is material " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)). " '[T]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " *Id.* (quoting *Kyles*, 514 U.S. at 433-34).

Jernigan argues that the November 2000 robberies, which occurred while she was in jail awaiting trial for the September 20, 2000 robbery, were material to the question of her guilt, because had she known about those robberies she could have pointed to a concrete (although unidentified) person with whom the five eyewitnesses may have confused her.

Jernigan also argues that knowledge of the November robberies would have affected her decision not to introduce cer-

tain exculpatory evidence. Specifically, the victim teller of the October 11, 2000 robbery (for which Jernigan was charged but never tried) could not identify that robber in the photospread containing Jernigan's picture. That teller, however, believed that she had been robbed by the person in the September 20 bank surveillance video—a video that is of only mediocre quality. According to Jernigan, this combination amounts to an "eyewitness opinion" that she, whose picture *was* in the photospread, was not the person in the September 20 surveillance video.

Despite having had this evidence from the victim teller of the October 11, 2000 robbery at the time of her March 2001 trial, Jernigan made the strategic decision not to introduce the evidence due to what she describes as the "prejudicial effect" that disclosure of a second robbery would have had. Jernigan now argues, however, that knowledge of the November 2000 robberies would have altered this strategic decision, especially because the description of the getaway vehicle for both the October 11 and November 30 robberies was similar—a dark-colored Toyota 4-Runner. We are unpersuaded by these arguments.

Jernigan was tried for and convicted of the September 20, 2000 robbery. The October 11, 2000 victim teller's statements about who robbed her would have scant probative value regarding the identity of the September 20, 2000 bank robber. It is also not at all clear that the jury in Jernigan's trial would have made the same double inferences that Jernigan makes from the statements of the October 11 victim teller. Even making such inferences, however, it is absurd to think that Jernigan's jurors, who observed her during the trial and watched the September 20 bank robbery surveillance video four times before convicting her, would have been swayed by an inferred opinion from the October 11 victim teller. This is especially true in view of the fact that Jernigan's jurors also heard all of the eyewitness evidence that identified her as the September 20, 2000 bank robber.

**[2]** The thrust of Jernigan's *Brady* claim is that the jurors in her trial might have lost confidence in the eyewitnesses' testimony had the jurors known of the November robberies. The reliability of the five eyewitnesses' testimony is, therefore, the central issue in this appeal.

Each of the five eyewitnesses viewed the FBI's six-woman photospread prior to trial and independently identified Jernigan as the robber. Each also independently identified Jernigan as the robber at her trial. Two of the eyewitnesses described close-range interactions with the robber. One of these, Elizabeth Chlupsa, was the victim teller during the September 20, 2000 robbery. She testified that shortly before the robbery she looked at the people in line waiting for a teller and "noticed a very, very short Hispanic, what I thought was Hispanic-looking lady, and a rather tall Chinese-looking man and I noticed it because of their height difference." The woman was wearing a tan hat with her very dark hair pulled back in a pony tail, a long sleeve denim shirt unbuttoned with a shirt underneath, had a "rounder face" that "looked like she may have had acne, kind of pocked," a "fairly small mouth," and wore "very, very, very dark eyeliner."

According to Chlupsa, this woman was fumbling with her bag as she approached Chlupsa's teller station. Chlupsa looked "right at her face" and asked: "How can I help you?" The woman looked up at Chlupsa, looked back down at her bag, and produced a piece of paper that she placed on the counter. Chlupsa was looking "right into her face, because at that time she had stopped fumbling through her bag and . . . just stood there waiting." She asked the woman once again: "How can I help you?"

Chlupsa testified that the woman "looked directly at me and she looked down at the paper and she pushed the paper over across the counter, towards me." The folded paper was a handwritten note saying something to the effect of: "Don't make a big scene, give me all your money, don't give me any

dye packs or tracking devices and don't press the alarm or else I will shoot." After reading the note, Chlupsa testified that "I looked up at her into her eyes and she kind of led me down to her hands with her eyes." Chlupsa then realized that the woman was pointing a partially concealed gun at her.

Chlupsa looked around, saw that no one else knew the robbery was occurring, and "realized that I was kind of alone and so then, I looked back at her." The robber gave Chlupsa a "[h]urry up" look, so Chlupsa emptied her cash drawer and looked "at her face, at her eyes" "as if to say 'Where do you want me to put the money?' " The robber held her right hand out, and Chlupsa handed over the cash. Shortly after the robber turned away, Chlupsa communicated the situation to Golliher, her supervisor, who yelled "she's been robbed." The robber then left the bank and ran away.

Chlupsa testified that the robber did not speak during the robbery, and explained that "I read her body language and basically she read mine, because there was a lot of eye contact." Two days after the robbery the FBI showed Chlupsa the photospread, and she identified Jernigan as the robber. Chlupsa also identified Jernigan as the robber at trial.

The other eyewitness who had a close-range interaction with the robber was Lorraine Hawley who stood ahead of the robber in the teller line. Hawley and the robber were separated by one other person who stood between them. Hawley testified that the robber was "very noticeable." She was wearing jean pants, a jean jacket, and a "ball cap" with her hair pulled back. Her eyes were "very dark brown" and "pronounced," and she had a poor complexion perhaps from "previous acne problems."

When Hawley became the first person in the line, one of the teller stations closed. Exasperated with the line's sluggishness, Hawley looked back at the woman who eventually robbed the bank and said: "You have got to be kidding me."

Hawley testified that, in response, "she looked at me, she kind of smiled." Hawley explained that:

> When I first said it, she smiled at me very—as if she was in agreement with me, or understood. At that time, I started to glance at her, and I was staring at her because she looked different to me. Number one, she resembles a girlfriend of mine . . . . I sat looking at her and at that point she—I stared for a very long time . . . . [W]hen she started to look down, I realized that I had been staring at her for an inappropriate amount of time.

Hawley broke off the stare, and "did a quick glance back to kind of smile at her, as if to say, I didn't mean to be staring at you."

Two days before testifying in court, and six months after the robbery, Hawley picked Jernigan's picture out of the six-person photospread as the woman who had been behind her in the teller line at the bank on the day of the robbery. She also identified Jernigan at trial, explaining that "[i]t is easier in person. Like I said she resembles a girlfriend of mine very close. They have a resemblance, so it was easy to identify her." The bank video showed that the woman Hawley identified as standing behind her in the teller line was the woman who robbed the bank.

**[3]** Like Chlupsa and Hawley, three other eyewitnesses each twice identified Jernigan as the robber—once using the six-woman photospread, and once again at trial. It is exceedingly unlikely that a misidentification would occur when all five people who witnessed the events at the bank on the day of the robbery identified Jernigan as the robber. Moreover, misidentification is especially improbable for witnesses like the teller, Chlupsa, who described a silent interaction replete with communicatory eye contact, and Hawley, who described having "stared" at the person she identified as Jernigan for an

"inappropriate" amount of time because she resembled a friend.

**[4]** Based on the eyewitnesses' testimony, the evidence against Jernigan was very strong. In the face of this evidence, we cannot say that the undisclosed evidence of the two November 2000 bank robberies, which were committed by someone other than Jernigan, casts such doubt on the evidence presented at Jernigan's trial that disclosure of these other bank robberies would have created a reasonable probability of a different result in her trial.[2] We are also persuaded that the jury's verdict is worthy of confidence.

**[5]** We conclude that Jernigan cannot satisfy the third prong (materiality) of the *Brady* test. The government did not violate Jernigan's due process rights under *Brady* by failing to disclose the evidence it had at the time of Jernigan's trial pertaining to the November 2000 bank robberies.

## B.  Rule 33 Claim

Jernigan argues that the post-trial arrest and conviction of Rodriguez-Gallegos, after the December 2001 bank robbery, along with the undisclosed evidence of the November 2000 bank robberies, entitles her to a new trial pursuant to Rule 33. We disagree.

**[6]** When a district court denies a Rule 33 motion for new trial based on evidence discovered after trial, we review for abuse of discretion. *United States v. Sarno*, 73 F.3d 1470, 1507 (9th Cir. 1995) (citing *United States v. Sitton*, 968 F.2d 947, 958-59 (9th Cir. 1992)). To prevail on a Rule 33 motion for a new trial based on new evidence, a defendant must satisfy the following five-part test:

---

[2]The dissent refers to polygraph evidence which the district court excluded. Jernigan does not mention the polygraph tests in her appellate briefs, nor does she argue their admissibility.

(1)  the evidence must be newly discovered;

(2)  the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part;

(3)  the evidence must be material to the issues at trial;

(4)  the evidence must be neither cumulative nor merely impeaching; and

(5)  the evidence must indicate that a new trial would probably result in acquittal.

*United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991) (citing *United States v. Lopez*, 803 F.2d 969, 977 (9th Cir. 1986)).

Jernigan falls short of the fifth requirement. In considering Jernigan's Rule 33 claim, together with the asserted *Brady* violation, the district court examined Rodriguez-Gallegos's photograph, taken after the December 11, 2001 bank robbery, and compared it with Jernigan's photograph and with Jernigan herself. The district court judge who heard the Rule 33 and *Brady* motions was the same judge who had presided at Jernigan's trial. That judge concluded "[t]he simple fact is that defendant [Jernigan] and [Rodriguez-Gallegos] do not look alike, whatever similarities may be in their complexions or Hispanic appearances."

**[7]** We have examined the photographs of Jernigan and Rodriguez-Gallegos, as well as the video of the September 20, 2000 bank robbery, and concur with the district court. Jernigan and Rodriguez-Gallegos are about the same size and have the same general physical makeup, but they do not look alike. We conclude that evidence of the December 2001 bank robbery, as well as the previously undisclosed evidence of the

November 2000 bank robberies, does not satisfy the fifth requirement for a successful Rule 33 new trial motion; a new trial would probably not result in Jernigan's acquittal if the newly discovered and previously undisclosed evidence were produced. Thus, the district court did not abuse its discretion by concluding that Jernigan is not entitled to a new trial under the provisions of Rule 33.

**AFFIRMED.**

---

B. FLETCHER, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's holding regarding Rule 33 but respectfully dissent from its ruling under *Brady v. Maryland*, 373 U.S. 83 (1963).

## I

Jernigan was initially charged with three robberies — a September 20, 2000 robbery at 15 East Guadalupe in Gilbert; an October 11, 2000 robbery at 906 East Baseline Road in Tempe; and an October 25, 2000 robbery at 2298 North Alma School in Chandler.[1] After Jernigan was placed into custody, two more banks were robbed in close proximity to the 15 East Guadalupe branch, by a person matching Jernigan's physical description — a short, Hispanic woman with acne. Those robberies took place on November 28, 2000 and November 30, 2000.

I find it highly unlikely that in a case like this, which turns exclusively and entirely upon eyewitness testimony, the jury would have convicted Jernigan had it known that robberies at

---

[1]Jernigan was tried only for the first robbery (the September 20 robbery) and an associated 924(c) count.

nearby banks by a short Hispanic woman with acne continued after Jernigan's arrest. But the prosecution never disclosed this information to Jernigan's defense team and never bothered to investigate whether this second robber — not Jernigan — actually committed the crime for which Jernigan was charged. The government's failure to disclose this highly relevant information about the subsequent robberies violates its obligations under *Brady*, causing me to respectfully dissent.

## II

A *Brady* violation takes place when the government withholds material, exculpatory evidence. "To establish a *Brady* violation, the evidence must be (1) favorable to the accused because it is either exculpatory or impeachment material; (2) suppressed by the government, either willfully or inadvertently; and (3) material or prejudicial." *United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004).

Information regarding the additional robberies was clearly favorable to Jernigan's case and never disclosed to the defense; consequently, *Brady*'s first two elements are established. The lapse was also material: the similarities in identity are uncanny, and the prosecution relied exclusively on visual-identification evidence. Thus, the possibility of wrongful conviction always lurked in the background of this case, and, plainly, there was " 'reasonable probability' that had the evidence been disclosed the result at trial would have been different." *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995).

The majority takes comfort in the testimony of a handful of eyewitnesses, but I am not so easily persuaded. "Centuries of experience in the administration of criminal justice have shown that convictions based solely on testimony that identifies a defendant previously unknown to the witness is highly suspect. Of all the various kinds of evidence it is the least reliable, especially where unsupported by corroborating evi-

dence." *Jackson v. Fogg*, 589 F.2d 108, 112 (2d Cir. 1978). Regrettably, the majority ignores this vital admonition.

## III

Jernigan was questioned because she was suspected of shoplifting and was a small Hispanic woman, not because of any known connection to bank robberies. The Government presented no evidence of any kind to corroborate visual identifications of Jernigan save an F.B.I. analysis of a surveillance video pegging the robber's height at just under five feet. The fingerprint lift did not match Jernigan's print, and the police found no firearms, clothing, money, or other items associating Jernigan with the robbery.

Subsequent to Jernigan's trial, Rodriguez-Gallegos was charged with the November 28 and 30 robberies, as well as a December 11, 2001 robbery of the same bank that Jernigan had allegedly robbed. By the time of the arrest, Jernigan had been convicted. Still, the prosecution could have — but did not — conduct any inquiry into whether Rodriguez-Gallegos had committed the robbery for which Jernigan was charged. It could have at least checked the fingerprint lift from the September 20 robbery with Rodriguez-Gallegos's print. Such tunnel vision puts into question the fair administration of justice.

Equally troubling are the inconsistencies within the eyewitness accounts. Elizabeth Chlupsa, the victim-teller on September 20, described the perpetrator as having plucked eyebrows, wearing "very very very dark eyeliner," "a lot of make-up," and a lot of eyeliner. By contrast, Lorraine Hawley, who said she looked at the perpetrator for an extended period of time, described the robber as wearing "little to no make-up" and no lipstick.[2]

---

[2]Witnesses seem to have had trouble determining whether the robber was Hispanic or Asian. Although I place less emphasis on these inconsistencies in identification, they, too, deserve mention: teller Kathleen Golliher, for example, described the perpetrator as "Hispanic," while Donovan Grierson, another bank customer, claimed he saw "a short Asian woman."

Chlupsa indicated both immediately after the robbery and during trial that the perpetrator had no tattoos and did not have painted fingernails. However, Jernigan has a number of tattoos on her hands and forearms, as evidenced in photographs submitted to the district court and confirmed by the FBI shortly after the arrest.

The eyewitnesses' tentativeness is equally telling. Hawley, who claimed to get a good look at the robber, had some trouble picking Jernigan out of a photospread, stating, "I want to say it looks like this one." And Golliher appears to have had trouble as well, stating, "By — I just felt that was the one that — that was whom I saw."

These problems are not altogether surprising given that all but one of the eyewitnesses viewed the photospread five to six months after the incident. Lorraine Hawley saw the photospread two days before trial — six months after the robbery. Three others — Kathleen Golliher, employee Yarjanic Nath, and customer Donovan Grierson — were all shown the photos five months after the robbery. This delay, which goes totally unexplained, also detracts from the reliability of the witness identifications.

Additionally, the district court excluded evidence conducted by a polygraph expert that supports Jernigan's claim that she was not the September 20 robber. The polygrapher asked Jernigan about the robbing of banks both as a general matter and in regard to the three banks for which she was originally arrested. The polygrapher listed each one of the banks, and Jernigan denied any involvement in those or other bank robberies. Her score of 17 indicates a truthful response (anything above a score of six is considered truthful). However, the district court excluded documentary evidence of the polygraph tests and precluded the polygrapher from testifying.

Finally, one cannot avoid the extremely low likelihood, based on crime statistics, that two short female Hispanic

bank-robbers with acne would even *exist* in such a small geographical area. In 2000 (the year all robberies in question took place), only six percent of all bank-robbery perpetrators were female; moreover, only six percent of bank-robbers overall (male and female) were Hispanic. *See Summary and Interpretation of Bank Crime Statistics, 2000* (Federal Bureau of Investigation, May 12, 2002). The likelihood of two small Hispanic female robbers holding up banks, let alone the same bank and other banks in the same area, is therefore extremely low.

## IV

If these problems with the trial — which the parties do not dispute — are not enough to warrant reversal, I'll pass briefly over additional disputed items that give me further reason for pause. Jernigan alleges that certain witnesses were not properly advised that the person who had robbed the bank might *not* be depicted in one of the six photographs; that certain eyewitnesses used a "process of elimination" approach in selecting Jernigan from the photospread; and that the *modus operandi* of all of the 2000 robberies bears a striking resemblance, as all involved a hand-written demand note, on folded paper, warning the teller not to set off any alarms.[3]

---

[3]Jernigan points out that the getaway car during the October 11, 2000 robbery (for which she was originally charged but not tried) — a black Toyota 4-Runner SUV — matched the description of the getaway car used during the November 30, 2000 robbery (for which Rodriguez-Gallegos was charged). Moreover, although the victim from the October 11, 2000 robbery could not identify the robber in the photospread containing Jernigan's photograph, the victim, when shown the image from the September 20, 2000 robbery, declared that the person in that photograph *was* the person who robbed her. Although the majority discounts the significance of these details, they suggest that, in fact, Rodriguez-Gallegos — not Jernigan — was the perpetrator of the September 20, 2000 robbery.

## V

When I consider (1) the lack of any evidence to corroborate visual identifications (save an F.B.I. analysis of a surveillance video pegging the robber's height at just under five feet), (2) the lack of any firearms, clothing, money, or other items associating Jernigan with the robbery, and (3) most importantly, the existence of another person matching Jernigan's physical description — a short, Hispanic woman with a pock-marked face — robbing nearby banks during the same time-period, in a case based entirely on visual identifications, I cannot have any confidence in the eyewitness identifications.

In light of all the above, we should simply remand for a new trial. If a jury still finds the prosecution's case compelling, that ends the matter, and the prosecution and this court can feel assured that the right person(s) remain(s) incarcerated. If it acquits, justice will have been served. If we don't remand, we must live with the doubts sown by the *Brady* violations and the anomalies in this unusual case, despite the nagging suspicion that mistakes might have been made.

## VI

Although I'm very concerned that an innocent person may have been wrongly convicted, that is not the critical point driving my dissent. Under *Brady*, the government had a duty to advise the defense of the continuing robberies. That information very likely could have affected the verdict. Jernigan was clearly deprived of "favorable evidence [that] could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (footnote omitted).

Further, of course, the suppression undermines confidence in the outcome of the trial and the integrity of the government as well as its prosecutors' dedication to justice. A new trial is clearly warranted. "[I]t is a miscarriage of justice . . . to con-

vict an innocent person." *United States v. Ameline*, 409 F.3d 1073, 1074, 1081 (9th Cir. 2005) (en banc) (citation omitted). In light of the uncertainties as to identity, I would order a new trial for Jernigan. I therefore respectfully dissent.